Collins, Judge,
delivered the.opinion of the court:
The issue in this action for the refund of corporate income taxes is whether plaintiff is entitled to a deduction for certain amounts which, according to plaintiff, constituted interest payments.[1] Defendant contends that the payments in question were dividends, not interest. In order to resolve this dispute, we must determine whether the advances with respect to which the payments were made represented (1) loans to plaintiff or (2) contributions to the capital of plaintiff.
The factual background, which is set forth in detail, infra, in the findings of fact, can be summarized as follows: During the pertinent years, ownership of plaintiff’s capital stock was divided equally among three brothers, Baiph, Norman, and Eli Freydberg. Plaintiff was engaged in chemical research and engineering, practically all of its work being done for companies controlled by the Freydbergs. In October 1950, the brothers learned that it might be possible for them to obtain one-half of the voting stock of Consolidated Trimming Corporation (hereinafter “Consolidated”), a manufacturer of furniture trimmings and other products.
At the time, the two principal stockholders of Consolidated were William Eosenberg, its president, and Joseph *340 Bernbard, its vice president. Rosenberg was considering disposing of at least part of Ms interest in the company. In January 1951, Eli Freydberg entered into negotiations with Rosenberg, and eventually the latter indicated willingness to sell for the price of $500,000 a total of 10,000 shares, consisting of 7,500 shares of non-voting stock and one-half of the voting stock, 2,500 shares. The Freydberg brothers concluded that Consolidated presented a favorable investment opportunity, especially in view of the fact that Bern-hard was agreeable to substituting Eli Freydberg for Rosenberg in the management of Consolidated.
Eli Freydberg informed Rosenberg that the offer was acceptable. However, before the sale was consummated, Bernhard learned for the first time that the purchase was to be made by the three brothers rather than by Eli individually. Bernhard stated that, with regard to voting and control, he preferred to deal with a single owner, not three. Thus, it was decided that ownership of the Freydberg shares should be placed in a corporation and that plaintiff should be used for this purpose.
Of the $500,000 needed for the purchase, plaintiff received $205,000, less discount, from the Irving Trust Company; the interest rate for this loan was S y2 percent per annum. As conditions for tliis loan to plaintiff, the bank required the personal guarantees of the brothers, the pledge of the Consolidated shares, and the subordination to the bank’s loan of any subsequent advances which would be made to plaintiff for the purchase of the Consolidated shares.
Plaintiff obtained the remaining amount, $801,000, from the following sources: the three brothers; an inter vivos trust which had been created by the parents of the brothers for the benefit of the brothers’ wives and children; and the estate of Aaron Freydberg, the father of the brothers. Ralph and Eli were the trustees of the inter vivos trust; and the three brothers were the co-executors and the sole beneficiaries of their father’s estate. The advances from these sources were evidenced by demand notes bearing interest at 5 percent per year. The sale was effected on April 10,1951, and, on that date, each of the conditions required by the bank was met.
*341 On October 10, 1951, the maturity date of its note, the Irving Trust Company required partial repayment to the extent of $55,000. To assist plaintiff in making the repayment, the estate advanced an additional $42,500 in exchange for another 5 percent demand note. Also, Ealph and Norman each advanced the sum of $5,000; no notes were issued to them, but these amounts were reflected in an account on which plaintiff was to make interest payments. On October 23,1951, the bank released the subordination agreement and the subordinated notes; and, on December 7,1951, the voting common stock was returned to plaintiff. On December 5, 1951, Consolidated had guaranteed the loan made to plaintiff by the bank.
On June 11, 1952, the balance of the Irving Trust loan (then $145,000) was assumed by the Public National Bank and Trust Company. The conditions of the Public National loan to plaintiff were like those of the original Irving Trust loan (i.e., subordination of the Freydbergs’ notes, etc.); the rate of interest was 4 percent per annum. Subsequent to the years in question, on July 21, 1958, the Public National loan was paid in full.
In addition to those mentioned above, other advances were made to plaintiff by the trust, the estate, and each of the brothers. Certain repayments were made to the trust and to the estate. With but small exceptions, the brothers have neither demanded nor received repayment of their individual advances to plaintiff. Eegarding all the advances, plaintiff accrued and paid interest regularly. The precise issue for determination is whether the amounts paid to the estate and to the brothers did in fact represent “interest.”
As far as formal matters are concerned, it is clear that plaintiff utilized the characteristics of indebtedness. For example, most of the advances were evidenced by promissory notes. However, the rule is well established that form is not controlling. See, e.g., Gilbert v. Commissioner, 262 F. 2d 512, 513 (2d Cir.), cert. denied, 359 U.S. 1002 (1959). In order to ascertain the true nature of transactions cast in the form of indebtedness, the courts look to all the surrounding circumstances. Although a fairly well-defined set of tests *342 has evolved, see, e.g., O. H. Kruse Grain & Milling v. Commissioner, 279 F. 2d 123, 125 (9th Cir. 1960), “there is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts.” John Kelley Co. v. Commissioner, 326 U.S. 521, 530 (1946).
With regard to the present case, it is our conclusion that the advances in question were not loans, but were, as the Government contends, contributions to the capital of plaintiff. Perhaps, the most effective way to demonstrate certain of the reasons for our decision would be to contrast the bank loans, on the one hand, and, on the other, the advances by the Freydbergs and the estate.
One significant factor is the matter of risk. E.g., Diamond Bros. Co. v. Commissioner, 322 F. 2d 725, 732 (3d Cir. 1963). If the repayment of certain advances is dependent upon the success of the recipient corporation, this suggests that the amounts were in fact an equity investment.[2] E.g., Dobkin v. Commissioner, 15 T.C. 31, 34 (1950), aff'd per curiam, 192 F. 2d 392 (2d Cir. 1951). With regard to the case at bar, the banks clearly wished to minimize the degree of risk to which their loans would be subject. As stated above, each of the lending institutions insisted upon personal guarantees, the pledge of Consolidated stock, and the subordination of other advances.[3] The Freydbergs, however, received no such protection. Rather, repayment of their advances “depended upon the success of Consolidated and its earnings as a going concern.” This undisputed fact is unfavorable to the position of plaintiff.
*343 If, as was originally intended, the brothers had bought the Consolidated shares directly, the present case would never have arisen. Their position as stockholders of Consolidated would have been obvious, and plaintiff corporation would not have been involved. As it turned out, though, plaintiff was utilized to accomplish the change of ownership of the Consolidated stock. However, the crucial fact is that, from the standpoint of the risk assumed by the Freydbergs, the intervention of plaintiff had virtually ho effect. Had the brothers made a direct purchase of the Consolidated shares, the worth of their investment would have hinged upon the successful operation of that company. The very same contingency governed repayment of the advances in question. This is a forceful indication that the advances were actually capital contributions. Cf. Gilbert v. Commissioner, supra, at 514.
The fact of subordination has itself been stressed. For example, in P. M. Finance Corp. v. Commissioner, 302 F. 2d 786, 789 (3d Cir. 1962), the court stated:
* * * The complete subordination * * * [of the rights of debenture-holders to the rights of various banks] not only tends to wipe out a most significant characteristic of the creditor-debtor relationship, the right to share with general creditors in the assets in the event of dissolution or liquidation, * * * but it also destroys another basic attribute of creditor status: i.e., the power to demand payment at a fixed maturity date. * * *
In the instant case, for almost the entire period involved, subordination agreements were in effect.[4] This meant that, to a considerable extent, the debtor-creditor attributes referred to in P. M. Finance Corp., supra, were absent. First, if plaintiff had been dissolved, the Freydbergs and the estate would not have enjoyed a status equal to that of either of the banks. Secondly, although the notes were demand in form, the right to demand repayment could not properly be exercised until the bank loans had been paid in full.[5] Cf. *344 General Alloy Casting Co., T.C. Memo. No. 64-148 (May 28, 1964).
Of course, another basic distinction between the advances under consideration and the bank loans is the fact that the latter were made by outside parties. The Freydberg brothers were the sole owners of plaintiff corporation. Moreover, we agree with defendant that the advances by the estate should be treated in the same manner as those by the brothers. Since the brothers were both the executors and the sole beneficiaries of the estate, it would be unrealistic to treat the estate as though it were a disinterested third party.[6] Cf. Commissioner v. Court Holding Co., 324 U.S. 331, 334 (1945).
In a number of cases, the courts have inquired as to whether an outsider would have made advances on the same conditions as those under consideration. H.g., O. H. Kruse Grain & Milling v. Commissioner, supra, at 126. Here, we have found that, in 1951, it would have been impossible for plaintiff, on the basis of its own assets, “to have borrowed from unrelated or commercial sources any substantial part of * * * [the $330,500 received from the brothers and the estate] on the same terms * * Finding 30. This is an additional factor which is adverse to the position of plaintiff.
When one-third of the amount received from the estate is attributed to each of the brothers, their 1951 advances to plaintiff are substantially proportional to their ownership of plaintiff’s capital stock,[7] and, to a great extent, this proportionality continued in the later years. This, according to defendant, is further evidence that the advances were in fact additional risk capital. Defendant’s argument is a valid one, for there was a sufficiently high degree of equality *345 among the respective total advances of the brothers. Cf. Gilbert v. Commissioner, supra, at 514.
Defendant asserts that, if the advances by the shareholders were actually debt, then their equity in plaintiff was “nominal.” That is, according to defendant’s calculations, plaintiff had a debt-equity ratio of approximately 131 to 1 on the date the original advances were made. Defendant used as shareholder equity the amount of $3,870.83 and as total indebtedness, $506,000.[8]
Plaintiff disputes defendant’s approach to this matter. First, plaintiff asserts that defendant failed to acknowledge the true worth of the stockholder equity. Citing, inter alia, In re Estate of Miller v. Commissioner, 239 F. 2d 729, 733 (9th Cir. 1956), plaintiff contends that real values, not book values, should be used in computing the ratio. According to plaintiff, the real value of the Consolidated shares was in excess of the book value of $500,000 and such excess should be included in the equity figure.
We cannot accept this argument of plaintiff, for we are unable to conclude that, as of April 10,1951, the actual value of the Consolidated shares was greater than the value reflected on plaintiff’s books. The price at which Rosenberg sold his Consolidated stock, $50 per share, was arrived at through arm’s-length transactions. Thus, we consider that price to be the best indication of the real worth of the stock as of April 10, 1951. Cf. United States v. Davis, 370 U.S. 65, 72 (1962). It follows that, on that date, the real and book values were the same.
Plaintiff correctly points out that, as time progressed, the value of the Consolidated shares and the amount of plaintiff’s capital increased. However, we are concerned primarily with the situation which existed on April 10, 1951, the date when the greatest part of the advances was made. Cf. Diamond Bros. Co. v. Commissioner, supra, at 731. Even accepting plaintiff’s view that non-shareholder debt should be excluded, the ratio as of April 10, 1951, was an extremely *346 high one.[9] As is true of the other factors, the debt-equity ratio is not in itself decisive.[10] Cf. Rowan v. United States, 219 F. 2d 51, 55 (5th Cir. 1955). Still, here, the ratio lends support to our conclusion.
To summarize, we hold that plaintiff is not entitled to a deduction for the amounts paid with respect to the advances made by the Freydberg brothers and by the Aaron Freyd-berg estate. We wish to indicate, however, that, although our decision is adverse to plaintiff, we do not accept the suggestion by defendant that the purpose of the Freydbergs was to devise a “tax avoidance scheme.” In our view, it is not necessary, nor would it be proper, to attribute such motives to the Freydberg brothers. Nonetheless, we consider the factors discussed above to be sufficient to show that the substance of indebtedness was lacking. It follows, therefore, that plaintiff is not entitled to recover, and the petition is dismissed.
FINDINGS OF FACT
The court, having considered the evidence, the report of Trial Commissioner Saul Richard Gamer, and the briefs and argument of counsel, makes findings of fact as follows:
1. Affiliated Research, Inc., was originally incorporated under the laws of the State of New York on October 27,1943, with its office and principal place of business in Brooklyn, New York. On June 28, 1954, it qualified to do business in the State of Connecticut and during that year transferred part of its business and activities to such State. From and after July 1955 its office and sole place of business was at Stamford, Connecticut. On September 30, 1957 (the end *347 of Affiliated’s fiscal year), a Connecticut corporation was chartered with the identical name as the New York corporation. Immediately thereafter the New York corporation of the same name was dissolved, distributing all of its assets and liabilities in liquidation to the Connecticut corporation. Subsequently the business originally carried on by the New York corporation was continued by the Connecticut corporation of the same name with the same assets and the same stockholders owning stock in the same proportion as originally.
The Connecticut corporation is the plaintiff herein, prosecuting a claim for refund of corporate income taxes for the 4 fiscal years ending September 30, 1954, to September 30,1957, i.e., the last 4 fiscal years of the life of the New York corporation. For convenience, however, both the New York corporation and the Connecticut corporation will hereinafter be referred to as the plaintiff.
2. (a) Prior to September 30, 1957, and during the taxable years herein involved, the New York corporation had outstanding three classes of stock which were owned by each of three brothers in the following amounts:

Tlie corporation’s authorized capital consisted of 300 shares of no-par common stock of which, however, only 229 shares were issued and outstanding, as set forth above. The capital account represented by these shares appeared on the corporation’s balance sheets for the years herein involved at $2,200.
(b) Immediately after incorporation, the Connecticut corporation issued 90 shares of its capital stock to the three Freydberg brothers, each receiving 30 shares in exchange for their respective stockholdings in the New York corporation.
3. Plaintiff kept its books, records, and accounts on the accrual basis of accounting and computed its Federal tax *348 liabilities on tbe same basis. Its taxable year was a fiscal year ending each. September 30 and it filed its Federal tax returns on that basis.
4. Freydberg Bros.-Strauss, Inc. (hereinafter referred to as Freydberg-Strauss), was a corporation originally founded by the father and miele of the three Freydberg brothers. It had engaged in the manufacture of various narrow fabrics, knitting yarns, trimmings, decorative ribbons and similar items. After the death of their father, Aaron Freydberg, on November 22,1950, the three brothers controlled this company. Eli was the brother primarily concerned with this enterprise. He worked continuously for the company from the time he graduated from college in 1924 until December 1950. He was president of the company and closely supervised all of its operations. On December 30, 1950, the three brothers sold all of their stock in Freydberg-Strauss to outside interests for approximately $635,000, consisting of a small amount of cash and the balance in notes.
5. Acme Backing Corporation (hereinafter referred to as Acme) was another company in which the three Freydberg brothers were financially interested. They owned virtually all of the stock of this corporation, the small number of other outstanding shares being owned by a few key employees of the company. All three brothers were directors and officers and Ralph and Norman actively worked for the company. Eli was not on the payroll of this corporation. However, he had a profit-sharing arrangement with the company which was designed to compensate him for any time he devoted to the company. This company and its subsidiaries manufactured a wide variety of products, including laminated and coated textiles, laminations and combinations of films and foils, plastic film, aluminum foil, and similar products.
6. In 1943, Freydberg-Strauss and Acme caused plaintiff to be organized essentially for the purpose of performing the specialized chemical testing and research work which they aiid their subsidiaries required. Since then plaintiff has been engaged in chemical research, analysis and engineering, as well as the supplying of consulting services in these fields. Included in such work is raw material testing and the development of new products. Freydberg-Strauss and *349 Acme were from the beginning plaintiff’s principal customers, about 95 percent of its business being performed for them. Acme, which had been originally located in Brooklyn, New York, moved its operations to Stamford, Connecticut, in 1954 and 1955. As above noted, plaintiff also moved its office and laboratory to Stamford at such times and, on a sublease, occupied space in the building leased by Acme. However, plaintiff has also performed some work for unrelated corporations and has had at least one contract with the United States.
Although, during the years herein involved, the bulk of the services of plaintiff, wholly owned and controlled by the three brothers, was performed for Acme and its subsidiaries, also controlled and almost wholly owned by them, and although the prices charged by plaintiff for its services were set by its officers and directors, i.e., the three brothers (but principally by Norman), such prices were generally in line with charges for comparable services on the open market.
7. During the fiscal years ended September 30, 1951, through 1957, Norman Freydberg was president of plaintiff and Ralph Freydberg was vice president and secretary. During the fiscal year ended September 30, 1951, Norman received a salary of $2,833.34 and Ralph received $2,500. During the fiscal years 1952 through 1957 they each received a salary of $3,000. Each devoted an average of 4 hours a week to the affairs of plaintiff. Eli Freydberg served as a director of plaintiff (as did Norman and Ralph) but held no office and received no salary. During this period plaintiff, a relatively small operation, had an average of approximately 7 employees working in its laboratory, although the number has at times gone as high as approximately 12.
8. In late October 1950, Eli Freydberg was approached by Myron Finke, senior partner in the certified public accounting firm of Klein, Hinds & Finke. This firm was the auditor for Freydberg-Strauss, Acme and its related corporations, and plaintiff. It was also the auditor for a well-known corporation in the field, the Consolidated Trimming Corporation (hereinafter referred to as Consolidated), a corporation organized under the laws of the State of New York with its principal office in New York City. Through this con *350 tact Finke was aware of a peculiar internal condition in Consolidated which he felt might be of mutual interest both to the Freydberg brothers and Consolidated, and he supplied Eli with operating figures, balance sheets, and other financial information relating to Consolidated.
One of the two principal stockholders of Consolidated, who was also its president, was William Eosenberg, who was about 70 years of age and seriously ill. He was devoting only a small amount of time and attention to the business. In addition he was unable to get along with the other principal stockholder and vice president, Joseph Bernhard. Eosen-berg was willing to withdraw from the business and sell at least some of his stock therein under terms whereby he would realize immediately a substantial amount of cash. He owned one-half of the voting stock of the company, as well as a large number of shares of non-voting stock.
Finke indicated to the Freydbergs that he regarded this situation as presenting a unique opportunity to acquire one-half of the voting control in an old, well-established company with a good earnings record but which was badly in need of young, aggressive management. Finke believed that Eli Freydberg had the knowledge, executive experience, and ability needed by Consolidated. Consolidated manufactured furniture and upholstery trimmings, fringes, webbings, and other types of decorative fabrics, as well as the hardware related thereto.
9. As hereinabove set forth, shortly thereafter (on November 22, 1950), the father of the three brothers died and this was soon followed (on December 30, 1950) by the sale by the brothers of their stock interests in Freydberg-Strauss. Thereafter, Eli, who had devoted his full time to Freydberg-Strauss, began seeking a new financial and business interest, and in connection therewith became actively interested in the Consolidated situation. There was no immediate need for his services in Acme to which the other two brothers were devoting their time. Although he received various offers of employment from concerns in the textile industry, he was not interested in any opportunity which was not coupled with an. ownership interest. The Consolidated situation appeared *351 to offer such an opportunity, and the three brothers agreed that the matter should be actively explored by Eli.
10. Thereafter, commencing in January 1951, Eli Freyd-berg and Rosenberg entered into a series of negotiations. Finally, Rosenberg indicated his willingness to sell to Eli his (and his wife’s) one-half interest in the voting stock of Consolidated, consisting of 2,500 shares of Class C common stock, plus 7,500 shares of Class A non-voting stock, a total of 10,000 shares, for $500,000, provided such amount would be paid in cash. This was equivalent to a price of $50 per share and was approximately equal to the book value, which they took to be $49.89 as of May 31, 1950 (the close of Consolidated’s last fiscal year). Despite further bargaining, Rosenberg refused to go below this figure. Thereupon Eli discussed the matter with his brothers and they concluded, after some informal discussions with one of their banking connections as to the approximate maximum amount of money the bank would lend to them to finance this stock purchase, that it would be possible for them to raise the requisite amount of cash.
The next steps were to further explore the Consolidated operation and to discuss the situation with Bernhard, the owner of the other one-half of the voting stock, to make certain, among other things, that he would be willing to accept and work with Eli as the owner of the other one-half of the voting stock of the corporation. It was the brothers’ objective to have Eli spend full time in the corporation in an important managerial capacity which would not only serve as a protection for their heavy investment but which would also provide Eli with a challenging full-time connection at substantial compensation.
11. Thereafter, Eli Freydberg and Bernhard had numerous discussions. Eli thoroughly investigated the Consolidated business, visiting various of its plants and studying its entire operation. He became convinced that the company was not realizing its full potential. At the same time, Bernhard became favorable to the idea of substituting Eli for Rosenberg in management and was agreeable to having Eli purchase Rosenberg’s important voting stockholdings in Consolidated. Bernhard concluded he and Eli could *352 work together amicably, which would necessarily have a beneficial effect upon the business operation. Eli too felt that he would be able to work harmoniously with Bernhard, and, after discussions, the Freydberg brothers concluded that Consolidated, with Eli in an important managerial position (Bernhard agreed he was to become an officer and a director), presented a favorable investment opportunity at the proposed $500,000 figure demanded by Rosenberg, and that it would also provide Eli with an advantageous, full-time connection. It was then agreed that Eli should advise Rosenberg that his offer to sell his stock upon the indicated terms was acceptable.
12. Thereupon, Eli Freydberg advised Rosenberg that he was willing to purchase the 10,000 shares for $500,000 in cash. However, Rosenberg then informed Eli that he had now decided that he also wanted to dispose of the balance of his stockholdings in Consolidated at the same time. In addition to the 10,000 shares he and Eli had previously discussed, Rosenberg (and his wife) owned 8,347 shares of Class A non-voting common stock and 8,117 shares of preferred stock. Rosenberg concluded he did not wish to continue to own such large amounts of stock and to have such a heavy financial investment in a company over which he would have no control, which would be the result of his selling his voting stock to Eli.
13. After further discussions between Eli Freydberg and Bernhard about this new problem,' Bernhard suggested that Consolidated itself purchase the balance of the Rosenberg stockholdings. However, since Consolidated had no large amount of cash available for the purpose, it would be necessary to make payment in bonds to be issued by the company. It was felt this would be satisfactory to Rosenberg since he had previously indicated that what he desired at this time was only approximately $500,000 in cash. The reasons given by Rosenberg for wanting to dispose of the balance of his stockholdings were not related to a present desire to convert a substantial part of his estate into cash.
It was then agreed between Eli and Bernhard that Eli would, on behalf of Consolidated, negotiate with Rosenberg for the purchase of the balance of his stockholdings on the *353 above basis. Although Eli at that time was not yet officially associated with Consolidated, he was, with Bernhard’s consent, already spending full time on a voluntary basis at Consolidated studying and becoming familiar with its operations. Furthermore, his past negotiations with Rosenberg with respect to the 10,000 shares put him in an advantageous position to continue the negotiations for the additional 16,464 shares.
14. There then followed another series of difficult, arm’s-length, bargaining sessions between Eli Freydberg and Rosenberg looking toward the disposition of all of Rosenberg’s stockholdings in Consolidated. It was finally agreed that, as a simultaneous transaction, and as a package deal so far as Rosenberg was concerned, Eli would purchase, in accordance with their previous negotiations, the 10,000 shares at the $500,000 cash figure, and that Consolidated would purchase the balance of Rosenberg’s Consolidated stock for $650,000 in bonds. The per share price of the stock purchased by Consolidated was approximately $38.97 for the 8,347 shares of Class A non-voting common stock and $40 per share (its par value) for the 8,117 shares of the preferred stock. Consolidated was to pay for the redemption of such stock by issuing to Rosenberg a series of 6 percent negotiable debenture bonds in the face amount of $650,000. This entire arrangement was satisfactory to Bernhard. The stock purchased by Consolidated was to be retired and placed in its treasury.
One reason for the lower per share price to be paid by Consolidated as against the Freydberg price was the voting control that attached to the Freydberg shares. In addition, that was the price previously agreed upon, and Freydberg considered it best under the circumstances to let that figure stand for that portion of the overall transaction.
15. Prior to the formal consummation of the purchase of the Rosenberg stock by the Freydbergs and Consolidated, Bernhard was apprised of the fact that it would be the three brothers who would jointly finance the purchase of the Freyd-berg portion of the stock and who would share in the ownership of such stock. Bernhard expressed some concern about *354 this divided ownership. For future voting and control purposes, he preferred to deal with one owner, not three. In addition, in the event of the death of any brother, wives or other heirs might enter the picture as new owners, further diversifying the ownership situation. For these reasons, it was agreed that, under the circumstances, the problem could be solved by causing the ownership of the Freydberg stock to be placed in a single corporate entity in which there would be continuity of ownership but in which, for their protection, the Freydberg brothers would hold equal interests and where there would be no other stockholders. Although a new corporation could have been set up for this purpose, plaintiff happened to have been already in existence and exactly fitted the purposes involved. Plaintiff’s certificate of incorporation gave it the power to purchase capital stock shares of any corporation, and, while the holder thereof, to exercise all the privileges and rights of ownership including the exercise of voting rights. The use of this corporation for the purpose was satisfactory to Bernhard and to the Freydberg brothers.
16. The Freydberg 'brothers were then faced with the problem of raising the required $500,000. Plaintiff itself, selected to be the vehicle for the stock purchase, did not have any funds that could be used for the purpose. Discussions with the Irving Trust Company, one of the banks with which the Freydbergs had long had banking associations in connection with their various interests, had indicated (finding 10) that the most the bank would lend to plaintiff for the purpose of financing the purchase of the unlisted, closely held, Consolidated stock would be, considering the corporation’s balance sheets and earnings statements, approximately $200,000, with interest at 3(4 percent (1 percent above the prime rate). Further, the bank would require the personal guarantees of the brothers, the stock itself to be pledged as collateral, and the subordination to the bank’s loan of any further advances that would be made to plaintiff for the purchase of the stock, i.e., no repayments could be made on any such advances until the bank loan was repaid in full. Thus, it became necessary to raise an additional $300,000 upon the subordination conditions prescribed- by the bank. The *355 brothers then agreed upon the raising of such additional amount in the following manner:
(a) The brothers themselves had available at that time the following amounts they could personally contribute: Ralph, $20,000; Eli, $86,000; and Norman, $24,000, making a total of $80,000.
(b) In May 1940, the brothers’ parents had created an inter vivos trust (hereinafter referred to as the Trust) for the benefit of the wives and children of the brothers. The Trust corpus consisted of a sum of money. Ralph and Eli were the trustees under the deed of trust dated May 21,1940, and had control over the Trust funds. Twenty-three thousand dollars in such funds were available which the brother-trustees could cause the Trust to advance to plaintiff.
(c) All three brothers were co-executors and trustees of the estate of their father, Aaron Freydberg (hereinafter referred to as the Estate), and they were also the sole beneficiaries thereof, in equal, one-third, shares. One hundred ninety-eight thousand dollars could be raised from the Estate’s assets which the brothers could cause the Estate to advance to plaintiff.
Thus, a total of approximately $30'0,000 could be raised to supplement the amount of $200,000 which the bank would lend for the purpose.
The brothers then decided that, in addition to the note which plaintiff would issue to the Irving Trust Company to evidence the loan which the bank would make, the further amounts which would be advanced to plaintiff as hereinabove set forth should also take the form of loans to plaintiff, and to evidence such loans plaintiff would similarly execute notes bearing interest at 5 percent per annum.
17. (a) On April 10, 1951, the purchase of Rosenberg’s Consolidated stock was effected in the manner above-described. On that date the Irving Trust Company advanced to plaintiff $205,000, less discount, at the rate of 3% percent per annum, evidenced by a $205,000 note executed by plaintiff on that date and due October 10,1951. At the same time cash funds aggregating $301,000 were transferred to plaintiff from the sources and in the amounts set forth in finding 16. These advances were all evidenced by demand *356 notes in conventional form bearing interest at 5 percent per annum, the notes being all executed by plaintiff on and dated April 10, 1951. Plaintiff reflected these transactions on its books in accounts designated “Notes Payable — Bank” and “Notes Payable — Others.” The same day, $500,000 in cash was paid to Eosenberg by plaintiff in exchange for 2,500 shares of Class C common (voting) stock of Consolidated and f,500 shares of Class A common (non-voting) stock. A special meeting of the board of directors of plaintiff was held on April 10,1951, which authorized Eli Freydberg to act as its proxy in voting the shares of stock of Consolidated thus acquired. After receipt of these shares from Eosenberg, the shares were delivered to the Irving Trust Company along with the note of plaintiff payable to the bank, the endorsed notes of plaintiff payable to the three Freydberg brothers, the Estate and the Trust, all to be held by the bank as collateral, and appropriate subordination agreements executed by the payees named on the notes. In addition, guarantees of the bank loan were also given to the bank by the three brothers.
(b) On the same day, Eli Freydberg became the treasurer and a director of Consolidated and its subsidiaries, and was placed on their payrolls at an aggregate salary of $32,000 a year.[1] The board and the stockholders of Consolidated, at special meetings held the same day, approved the transfer of the shares from Eosenberg to plaintiff as well as the retirement of the other non-voting shares obtained from Eosen-berg at that time for 25-year debenture bonds issued to Eosenberg, and these transfers were then accomplished. Following such transfers the capital stock structure of Consolidated was as follows:

*357 18. October 10,1951, was the maturity date of the Irving Trust Company note (finding 17 (a)). At that time the bant required partial repayment of the loan to the extent of $55,000. Plaintiff itself did not have funds sufficient to make such a payment. In order to make these funds available, the Estate advanced an additional $42,500 to plaintiff and, to evidence said advance, plaintiff at that time executed another 5 percent promissory demand note to the Estate in such amount, which was similarly reflected in its books in its “Notes Payable — Others” account. Also, Ralph and Norman Freydberg at the same time each individually advanced the sum of $5,000 to plaintiff. No notes were issued by plaintiff for these amounts aggregating $10,000 which are reflected in an account in plaintiff’s books called “Due to Officers.” Thereupon, plaintiff paid $55,000 toward the principal of the loan and a renewal note for $150,000 was issued. This note was due April 10, 1952, and again bore interest at 3y2 percent per annum, which was discounted. On October 23, 1951, the subordination agreements and the subordinated notes were released and on December 7,1951, the 2,500 shares of Consolidated’s Class C voting common stock were also released. On April 10,1952, the Irving Trust loan was again renewed for 6 months. This time, however, the note was discounted at the increased interest rate of 4 percent per annum. Plaintiff paid $5,000 toward the principal of this note on April 21,1952, leaving a balance due of $145,000.
19. (a) On December 5,1951, Bernhard, the three brothers, and plaintiff entered into a written agreement the effect of which was to recognize the co-equal ownership of Bern-hard on the one hand and the Freydbergs, operating through plaintiff, on the other, with respect to the voting stock of Consolidated. The agreement was intended to insure the opportunity of either of these half-owners to acquire the stock of the other half-owner in the event of death or other catastrophe. Other provisions were designed to protect Bernhard in the event of a change in control of stock ownership in plaintiff. However, under this agreement the brothers bound themselves to retain control of plaintiff through majority stock ownership. The agreement was to continue *358 as long as Bernhard and Eli Freydberg lived and both Bern-hard and plaintiff owned Consolidated voting common stock. This agreement, although dated December 5, 1951, formalized the oral understandings that had been arrived at between the Freydberg brothers and Bernhard when the stock purchases had been effected.
(b) On the same day, plaintiff and Consolidated entered into another agreement under which Consolidated agreed to guarantee the loan which plaintiff had received from Irving Trust in the then amount of $150,000. In return for Consolidated’s execution and delivery of such a guarantee, plaintiff agreed that if it should default in its payments to the bank and if Consolidated would have to make good on its guarantee, Consolidated would receive the stock then on deposit with Irving Trust as collateral for the loan. The guarantee of Consolidated was intended to have and did have the effect of causing the bank to relinquish, as hereinabove set forth (finding 18), the 2,500 shares of Class C voting common stock of Consolidated which had been deposited by plaintiff with the bank as collateral for its loan. This permitted those shares to be voted at the annual stockholders’ meeting of Consolidated. An additional reason for the .guarantee and the retrieval of the voting shares was Bern-hard’s belief that the other agreement of December 5, 1951, would be of no practical effect if plaintiff defaulted on its bank loan while the bank still held the shares. The 7,500 shares of non-voting common stock were not affected by these arrangements and were not withdrawn as collateral at this time.
20. One of the banks with which Consolidated had done business over the years was The Public National Bank & Trust Company (later known as the Bankers Trust Company) . Shortly prior to June 11,1952, the Freydbergs concluded, for certain reasons, that it would be desirable to have the then $115,000 balance of the Irving Trust loan taken over by Public National, which agreed to do so upon certain terms and conditions. An examination of Consolidated’s audited financial statements indicated to the bank a book value of *359 Consolidated’s stock of $68.75 per share at that time.[2] On said date of June 11, 1952, the transfer of the loan was accomplished by having Public National lend plaintiff $145,-000 which was used to pay off the balance of the Irving Trust loan. The rate of interest on the Public National loan was 4 percent per annum. The three Freydberg brothers personally guaranteed the loan. The notes of plaintiff that had been issued to the three Freydberg brothers, the Trust and the Estate, were delivered to Public National and, by subordination agreements, made subordinate to the bank note. Plaintiff was further required to deposit as collateral the 7,500 shares of Consolidated’s Class A common stock.
The Public National loan was, after a series of partial repayments and renewals in reduced amounts, ultimately repaid in full on July 21,1958, at which time the subordination and guarantee agreements were terminated and the collateral notes and Consolidated stock released.
Between April 10, 1951, and September 30, 1957, the notes payable to the banks by plaintiff were reduced by payments of principal from $205,000 to $25,000, a decrease of $180,000. Of this amount, about $140,000 was derived from available cash and profits and the balance of about $40,000 was obtained through additional loans from the brothers.
21. In June 1952, the month the Irving Trust loan to plaintiff was taken over by Public National, plaintiff was again in need of funds and an additional amount of $13,800 was advanced to plaintiff by the Trust. This amount was evidenced by a 4 percent demand note due in 18 months. Thereafter, in May 1954, plaintiff repaid to the Trust $6,000, leaving a balance due of $30,800. This obligation continued unpaid from that time until November 1959, when the Trust was liquidated. At that time, the wives of Norman and Eli Freydberg, namely Shirley PI. Freydberg and Dorothy S. Freydberg, each received one-third ($10,266.67) of plaintiff’s notes payable to the Trust. Ealph Freydberg, whose wife had died, personally received an equivalent one-third.
*360 Interest was accrued or paid by plaintiff to the Trust during the taxable years here in issue.
22. The advances made to plaintiff by the three brothers as executors of the Estate in the amounts of $198,000 and $42,-500 on April 10 and October 10, 1951, respectively, as here-inabove set forth, resulted in the Estate’s being unable to pay its Federal estate tax liability. The Federal estate tax return was filed on February 20,1952, disclosing a tax liability of $54,928.70. The Estate paid only $6,000 at the time of filing the return and requested an extension of time in which to pay the balance. This, and successive requests, were granted, with partial payments being made from time to time. The Estate was finally terminated in December 1958 at which time the notes payable by plaintiff to the Estate were transferred to the three Freydberg brothers in equal amounts.
Interest on the balances due on the two notes was paid or accrued. Repayments by plaintiff to the Estate were made from time to time on the $42,500 note until, by November 1956, the balance was reduced to $17,000. However, an additional advance to plaintiff by the Estate in the amount of $3,000 in that month raised the balance then due thereon to $20,000. Both notes thereafter remained with such principal balances of $198,000 and $20,000 until December 1958 when these amounts were distributed equally to the three brothers in final liquidation of the Estate. Each of the brothers received as a distribution a note of $72,666.67 executed by plaintiff.
23. Subsequent to October 1951, when two of the brothers advanced the additional amount of $10,000 to plaintiff (finding 18), each of the three brothers from time to time advanced further moneys to, and received certain repayments from, the plaintiff. The moneys so advanced were evidenced by 5 percent demand notes and were carried on the books of the plaintiff in the account denominated “Notes Payable— Others.”
Except for some small repayments made on their individual advances, the brothers have never made a demand for payment of the funds advanced by them to plaintiff, either *361 for tlie advances evidenced by the demand notes or for the advances not so evidenced.[3]
24. The table set forth on the following two pages constitutes an abstract from plaintiff’s records of its “Notes Payable” and its “Due to Officers” accounts for its fiscal years ended September 30, 1951, through September 30, 1961. It shows the bank loans and the repayments thereof, the amounts advanced to plaintiff by the three brothers individually, by the Estate, and by the Trust, the repayments made by plaintiff with respect to all such advances, and the balances due as of September 30,1961.
25. (a) Insofar as interest thereon is concerned, the bank loans and the other advances to plaintiff made by the three brothers individually, the Trust, and the Estate were all similarly treated by plaintiff. Periodically, and at the end of each fiscal year, plaintiff accrued interest liability in its books under the 5 percent interest provision in the notes, except in the case of the bank notes which drew interest at other specified rates, and except in the case of one advance by the Trust which carried a 4 percent interest rate (finding 21). The open account denominated “Due to Officers” also drew interest at 5 percent each year. All such accrued interest was computed on unpaid balances and subsequently discharged by payment. This is true of the tax years here involved as well as the other years subsequent to 1951.
The aggregate of these interest accruals (plus other unrelated interest items) was reflected as an interest deduction on the Federal income tax returns filed for each of the fiscal years in which the interest was accrued, commencing with the year ending September 30,1951, and running through the taxable years here involved.

*362

*363

*364 (b) The rate of 5 percent on the advances made by tbe Estate, the Trust, and the brothers as individuals was fixed by the brothers and was made slightly higher than the rates fixed by the banks on their loans because, among other reasons, these advances would not have the benefit of the collateral which the banks had. No contention is made by defendant that such rate was unreasonable (i.e., if, as a matter of law, the advances are to be considered as true loans).
The record does not indicate the considerations that went into the fixing of a rate of only 4 percent on the $13,800 advanced by the Trust to plaintiff in June 1952.
(c) After the Internal Revenue Service, as will hereinafter appear, began to treat the 5. percent payments to the Estate and to the individual brothers as dividends, such payments by plaintiff ceased.
26. (a) Plaintiff’s income, expenses and profits before taxes for the fiscal years ending September 30,1951, through September 30,1957, were as follows:

(b) The “Dividend Income” was all received from Consolidated on the common stock plaintiff held. Consolidated had never paid a dividend to its common stockholders prior to 1952.
(c) For the fiscal year ended September 30, 1950, plaintiff’s gross income (which was all from consulting fees) was $30,727, and its total expenses were $32,836.72, resulting in an operating loss of $2,109.82. After certain adjustments, there resulted a net loss for the year of $1,641.03.
27. (a) Plaintiff’s audited balance sheets as of October 1, 1950, and September 30, 1951, were as follows:

*365

(b) From the year ended September 30, 1951, through September 30, 1957, plaintiff’s balance sheet condition steadily improved. As shown by finding 26(a), it earned profits every year during this period. By the end of the period, its surplus account, which increased every year during the period, aggregated $117,174.69. The following chart shows the annual increase in plaintiff’s surplus account during such period:
Fiscal year ending:
September 30,
1951_ $3,184.23
1952_ 17,650.55
1953_ 36,134.33
1954_ 59,535.35
1955_ 73,455.37
1956_ 91,534.45
1957_ 117,174. 69
*366 28. As of the end of each of the taxable years here in issue, plaintiff’s cash balance was as follows:

September 30 Cash Balance

1954_ $2, 513.49
1955_ 4,998.3C
1956_ 2,000.93
1957_ 7, 720.37
29. From April 10,1951, through the taxable years here in issue, plaintiff did not make any payments to its shareholders which it denominated as dividends on its outstanding shares.
3Q. As shown (findings 17, 18), in April 1951 the Estate and the three brothers as individuals advanced $278,000 to plaintiff to supplement the loans from the bank and the Trust in order to enable plaintiff to purchase the Consolidated stock ($198,000 from the Estate,' $36,000 from Eli; $24,000 from Norman; $20,000 from Ralph), and in October of that year, the Estate and two of the brothers individually advanced an additional $52,500 to plaintiff ($42,500 from the Estate; $5,000 from Norman; $5,000 from Ralph) to enable plaintiff to make a $55,000 payment on account of the bank loan. Thus, a total of $330,500 was advanced to plaintiff in 1951 by the Estate and the three brothers individually. In 1951, it would not have been possible for plaintiff, simply on its own assets, to have borrowed from unrelated or commercial sources any substantial part of such amount on the same terms as those given by the three brothers individually and by the Estate, i.e., without any guarantees or collateral, and on a subordinated basis. Repayment by plaintiff of such advances depended upon the success of Consolidated and its earnings as a going concern. At that time the value of Consolidated’s physical assets, in the event of a bankruptcy or a similar liquidation, would not have been sufficient to enable a repayment of these subordinated advances.
31. The confidence the three Freydberg brothers placed in the soundness of the investment in the Consolidated stock, backed up by Eli’s connection with the company in an important managerial capacity, has justified itself. Although prior thereto Consolidated (and its subsidiaries) was doing well, sharing with another company, on an approximately equal basis, the leadership in the industry, since 1951 it has *367 forged ahead so that it is now by far the-leader in its industry. Its sales are worldwide, with plants in New York, Pennsylvania, South Carolina, California, and Canada. Over the years it has published annually a popular decorating book called “1001 Decorating Ideas.” This circulation has gone from approximately 150,000 in 1951 to approximately 1,000,000 in 1962, making it the largest paid circulation of any annual publication in the United States. Sales (including those of its subsidiaries) have increased from approximately $7,000,000 in 1951 to approximately $15,000,000 in 1962, and there have been substantial profits and increases in net worth each year. By 1961, the company’s common stock had a book value approximately 2% times as great as that of April 1951, i.e., from around $50 per share (finding 10) to approximately $130 per share. No dividends had ever been paid on the common stock prior to 1952. By 1961 the common stock was paying dividends of $2.80 per share, having been raised from $1.00 in 1952, to $2.00 in 1953, to $2.60 in 1960, and to $2.80 in 1961.
32. Plaintiff timely filed its Federal income tax return for the fiscal year ended September 30, 1954, with the District Director of Internal Revenue at Brooklyn, New York. Its Federal income tax returns for the fiscal years.ended September 30, 1955,1956, and 1957, were filed with the District Director of Internal Revenue at Hartford, Connecticut. Plaintiff’s income tax liabilities, as set forth on the returns as originally filed, and based on the interest accruals or payments on all the advances to it made for the purpose of purchasing the Consolidated stock being considered as expense deductions, were:
September 30,
1954_$1,881.92
1955_ 749.34
1956_ 852.90
1957_ 3, 695.44
33. (a) The Federal income returns filed by plaintiff for the taxable years ended September 30, 1951, 1952, and 1953 were not audited by the Internal Revenue Service and, therefore, none of the interest deductions claimed by plaintiff was disallowed on those returns.
*368 (b) However, plaintiff’s returns for the years ended September 30, 1954, 1955, 1956, and 1957 were audited by a revenue agent who also examined plaintiff’s books and records and who made inquiry of the brothers or their representatives concerning the matter of the Consolidated stock purchase, the advances that had been made to plaintiff to finance such purchase, and the large interest deductions that had been taken by plaintiff with respect thereto. The agent concluded that the interest deductions with respect to the advances made by the three brothers individually and by the Estate should be disallowed because, in his opinion, these advances were in reality contributions to capital and did not, therefore, constitute bona fide indebtedness. He felt that the moneys advanced by the Estate were really the personal funds of the three brothers since, being both the executors and beneficiaries, they had complete dominion and control over the Estate, and that the only reason for the continuation of the Estate as such was one imposed by the brothers themselves. It was the large advances made by the Estate to plaintiff which prevented the Estate from being closed. Accordingly, he placed all the individual and Estate advances in the same category and concluded that the “interest” payments (or accruals) made by plaintiff in respect thereto were in fact nondeductible dividends. However, he concluded that the interest deductions taken with respect to the advances made by the Trust should be allowed to stand because he felt that the beneficiaries of the Trust (the wives and children) had interests in the Trust that were at least technically adverse to that of the brothers, and that, in view of the fact that the Trust was under the supervision of the New York State courts, he would accept the transaction on its face as cast by the trustees. He was of the opinion, however, that the moneys lent by the bank and the Trust, taken together, should be considered as the maximum amount which outside investors would be willing to lend under the circumstances involved. Accordingly, the agent proposed the disallowance on said returns of the interest deductions taken with respect to the advances of the Estate and the three brothers individually. However, no disallowance of the interest deductions was proposed for the taxable years ended *369 September 30, 1951, 1952, and 1953 because the agent concluded that, by the time of his examination in the summer of 1958, the statute of limitations barred additional assessments for those years.
34. By letter to plaintiff dated July 16, 1958, the revenue agent advised of the adjustments proposed to be made for the 4 fiscal years in question and stated that plaintiff could, upon so advising in 10 days, have an informal conference to secure a review of the proposed adjustments. Attached to this letter was a statement indicating the proposed dis-allowance of the aforesaid interest expense in each of the years involved. In explanation it was stated that “after a review of the various factors involved in this case it is held that advances and loans by the three individual stockholders are in fact contributions to capital, and the interest deductions attributable to these advances are taxable distributions to the stockholders and not deductible by the corporation.” [5] Following a conference on August 19,1958, the District Director of Internal Kevenue at Hartford, Connecticut, on September 23, 1958, issued a so-called 30-day letter to plaintiff reflecting the same adjustments for the same years. The letter stated that plaintiff could file a protest within 30 days which would be followed by a conference, or could agree to the proposed deficiency, but that if plaintiff did neither, a statutory notice of deficiency would issue. Attached to the letter was a report which explained that the interest expense in dispute for each of the years involved “is held to be a nondeductible distribution of earned surplus.”
35. On October 23,1958, plaintiff submitted to the office of the District Director, Hartford, Connecticut, a “Protest” *370 with respect to the deficiencies proposed by the revenue agent, urging that the “loans and advances” in question “were bona fide debts and the interest paid thereon was deductible” and not, as held by the revenue agent, “contributions to capital” with the “interest payments and deductions attributable thereto” constituting “taxable distributions to the stockholders and not deductible by the taxpayer.” Among other things, plaintiff argued that the fact that notes were issued “at prevailing interest rates, commensurate with the risks involved,” that these “notes were treated on the books as current liabilities and not as capital,” that “under the terms of the notes, interest had to be paid and was not dependent on earnings,” that “interest was always paid since inception according to the terms of the obligations,” and that, as to the Estate, “substantial repayments were made,” all “indicates conclusively * * * that the stockholders intended a debtor-creditor relationship” and that the advances “were not meant to be an investment, permanent or otherwise.” Plaintiff pointed out that “the notes, in question here, were not riddled with provisions which would indicate a security rather than a debt.”
Further, plaintiff disputed the revenue agent’s contention that the “Debt-equity ratio was excessive.” In this connection, plaintiff first pointed out that plaintiff’s equity or total capital should be calculated on the basis of “the actual value” of the Consolidated stock, rather than its $500,000 value as shown on plaintiff’s books, and that therefore to plaintiff’s “Total Capital,” as shown on its books and balance sheets, should be added the increased value of the stock since its purchase. Plaintiff arrived at such increased value by adding to the $500,000 which was paid for the stock the amount of Consolidated’s earnings allocable thereto which had not been distributed as dividends. From the date of the purchase of the stock through Consolidated’s fiscal year ending May 31,1957, such amount of undistributed income was $286,615.74, which amount, added to the $500,000, gave the stock owned by plaintiff, according to this calculation, a 1957 value of $786,615.74. Breaking down the retained earnings increase by years, plaintiff showed that the ratios of the advances in dispute to plaintiff’s capital, so calculated, were *371 only 2.04, 1.07, 0.92 and 0.78 as of September 30, 1954, 1955, 1956, and 1957, respectively.[6]
Even taking the value of the Consolidated stock as $500,000, which was the value thereof actually shown on plaintiff’s books (being the amount paid therefor), plaintiff pointed out that the ratios of the advances in dispute to plaintiff’s capital were only 5.26,4.15,3.40 and 2.66 as of September 30, 1954,1955,1956, and 1957, respectively.[7]
Plaintiff therefore concluded that: “The entire background attendant upon the creation of the loans and advances, the book treatment and the terms of the obligations clearly indicate that the parties intended a debtor-creditor relationship. In addition, as has been clearly set forth, the taxpayer’s capitalization is not ‘thin’.”
36. (a) After conferences held on March 17 and April 8, 1959, the Commissioner of Internal Revenue, by letter dated June 23, 1959, gave plaintiff notice of defieiences in its Federal income taxes as follows:
Taxable year ended:
Sept. 30, Deficiency
1954-$4,801.50
1955- 3,856.02
1956- 4,534. 07
1957- 5, 513. 74
$18,705.33
*372 The deficiencies were based on the disallowance of the same interest expense items disallowed in the 30-day letter and were in the respective amounts of $16,005.02, $15,699.26, $16,003.14, and $15,968.74. The “statement” attached to the letter stated in part:
* * * it has not been established that these amounts constitute interest on indebtedness within the meaning of the provisions of Section 23(b) of the Internal Revenue Code of 1939 and Section 163 of the Internal Revenue Code of 1954.
(b) As shown, although not expressly stated, the Commissioner disallowed in each year that portion of the total accrued interest deduction attributable to the advances from Ralph, Eli, and Norman Freydberg and from the Estate. He did not disallow any portion of the deduction for any year attributable to loans from the Trust or from the banks. In some of the years other small miscellaneous interest items have been allowed and are not here in controversy. The following is a table of the amount of interest expense deducted by plaintiff on its 1951-57 income tax returns and the amounts which were disallowed by the Commissioner:

*373 37. Plaintiff took no action upon receipt of the proposed deficiency assessments and accordingly, in due course, the deficiencies were assessed. The amounts assessed together with interest were paid by plaintiff to the District Director of Internal Revenue at Hartford, Connecticut, on or about November 10,1959.
38. (a) Three separate claims for refund were timely filed by the plaintiff on November 27, 1959, with the District Director of Internal Revenue at Hartford, Connecticut, for the fiscal years ended September 30, 1955, 1956, and 1957. These three claims were in the total amount of $13,903.83 of tax and $2,298.45 of deficiency interest, as follows:

Fiscal year ending Sept. SO Corporate income tap Assessed interest

1955_ $3,856. 02 $896.39
1956- 4, 534.07 781.96
1957- S, 513.74 620.10
Totals- 13,903. 83 2,298.45
(b) On or about December 28,1959, plaintiff timely filed a claim for refund with the District Director of Internal Revenue at Brooklyn, New York, in the amount of $4,801.50, representing tax and $1,404.27 of assessed interest paid for the fiscal year ended September 30,1954.
39.(a) Up to the time of filing the petition herein on August 12, 1960, neither the Secretary of the Treasury nor his delegate has taken any official action to deny plaintiff’s refund claims and plaintiff has not received by registered mail a notice of disallowance from the Secretary of the Treasury or his delegate with respect to said refund claims. Said claims were on file for more than 6 months.
(b) Plaintiff has never received refund of any portion of the amounts claimed in the said refund claims filed with respect to the plaintiff’s corporate income tax liabilities for the fiscal years ending September 30, 1954, 1955, 1956’, and 1957, nor has the plaintiff been credited in any manner for tax purposes or otherwise with any portion of the amounts claimed in said refund claims.
*374 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that plaintiff is not entitled to recover, and the petition is dismissed.

 Four years are involved, i.e., plaintiff’s fiscal years ending September 30, 1954, through. September 30, 1957. The pertinent statutory provisions, which are essentially identical, are § 163, Int. Rev. Code of 1954, and § 23(b), Int. Rev. Code of 1939, 53 Stat. 12.
For a definition of the term “dividend,” see § 316, Int. Rev. Code of 1954, and § 115(a), Int. Rev. Code of 1939, 53 Stat. 48.

 Plaintiff asserts that, with regard to the factor of risk, there is no meaningful distinction between loans and contributions to capital. We do not agree. It is true, as stated in Byerlite Corp. v. Williams, 286 F. 2d 286, 292 (6th Cir. 1960), that any unsecured loan involves “more or less risk.” However, all risks are not the same. In dealing with a particular case, it is important to determine the nature and degree of the risk assumed. See, e.g., Moughon v. Commissioner, 329 F. 2d 399, 401 (6th Cir. 1964). In the ease at bar, the banks sought to insulate their chances of repayment from the vicissitudes of the business enterprises, but, as will be indicated, the same was not true of the Freydbergs.

 Between October 23, 1951, and June 11, 1952, no subordination agreement was operative. See findings 18 and 20. This lapse does not alter our conclusion regarding the overall significance of the agreements.

 See footnote 3, supra.

 In fact, certain repayments were made, in technical violation of the subordination agreements, to the brothers, the trust, and the estate. With these exceptions, the terms of the agreements were observed.

 Plaintiff asserts that it was inconsistent for the Goverament to allow the deductions for payments made to the trust and to disallow those made to the estate. The reasoning of the revenue agent is set forth in finding 33(b). Whether or not this differential treatment was valid, it does not afford the basis for recovery by plaintiff. In order to prevail, plaintiff must make a positive showing of its entitlement to the deductions in question.

 In 1951, the estate advanced a total of $240,500. One-third of this amount is $80,166.67. Attributing one-third to each brother, their total advances in 1951 were as follows: Ralph, $105,166.67; Eli, $116,166.67; and Norman, $109,166.67.

 As the amount of debt, defendant used the total of (1) the bank loan and (2) the advances by the trust, the estate, and the brothers. The amount of equity represents the average of plaintiff’s capital stock, earned surplus, and undivided profit at the beginning and at the end (September 30, 1951) of the fiscal year which included the date of the original advances. See finding 27(a).

 On the date In question, non-shareholder debt totaled $228,000 (i.e., Irving Trust Co., $205,000; the trust, $23,000). Thus, the ratio of shareholder debt to equity was $278,000 to $3,870.83 (see footnote 8, supra) or approximately 72 to 1.

 Citing Earle v. W. J. Jones & Son, Inc., 200 F. 2d 846 (9th Cir. 1952), plaintiff asserts that even an apparently high debt-equity ratio may be justified by the prospect of future earnings. This contention is essentially a variation of the doctrine that a particular factor must not be viewed in isolation, but must be considered in light of all the circumstances. Here, the fact that Consolidated appeared originally to be and actually turned out to be a sound investment is not determinative. Our study of the relevant transactions compels the conclusion that the advances in question did not result in a true debtor-creditor relationship.

 As of 1962 he was receiving a salary of $45,000 per year.

 This 'was evidently based on preliminary audit results. Consolidated’s fiscal year ended May 31, 1952. When the loan was made on June 11, 1952, the fiscal year had just been completed. The final audit of such year’s operations, issued on July 25, 1952, showed the book value as of May 31, 1952, to be $83 per share.

 As to the notes that were pledged to Public National as security for Its loan, repayment of any part thereof was subordinated to the bank loan. Therefore, repayment of any part of the brothers’ advances was not supposed to be permitted prior to July 1958, when the bank loan was finally repaid in full. Thus, the small repayments made to the brothers prior to July 195S were technically in violation of the subordination agreements.
Subsequent to July 1958, repayment of the advances was complicated by the position then taken by the Internal Revenue Service concerning how the advances should properly be considered for tax purposes.
Similarly, the repayments made by plaintiff to the Trust (finding 21) and to the Estate (finding 22) prior to July 1958 similarly appear to have constituted at least technical violations of the subordination agreements.

 The statement went on as follows:
“This position is based on the following:
1. There is a complete identity of interest between and among the three lendors, coupled with their control of the corporation.
2. No real intent to enforce payment. Obligations on demand basis.
3. Subordination of loans to outside creditors. Evidenced by reduction of bank loan while increasing stockholders advances.
4. Debt-equity ratio excessive.
5. Substantially proportionate advances.
6. No authorization for stockholders loans in the corporate minutes.
7. Lack of dividends paid.”
The revenue agent, as stated, considered the advances by the Estate as equivalent to advances by the three brothers Individually.

 For the years in question, such advances and capital were as follows:

 Calculated as follows: