AMBASSADOR APARTMENTS, INC., PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

LOUIS LITOFF AND ROSE LITOFF, PETITIONERS v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos.. 6519-65, 6520-65.   Filed May 6, 1968.

*Hillel J. Auerbach* and *Alexander Winnick*, for the petitioners.
*Charles M. Costenbader* and *Richard J. Mandell*, for the respondent.

SIMPSON, *Judge:* The respondent determined deficiencies in the income tax of the petitioner Ambassador Apartments, Inc., of $3,676.07 for the taxable year 1960, and $2,971.50 for the taxable year 1961, and

in the income tax of the petitioners Louis and Rose Litoff of $3,477.33 for the taxable year 1960. This case involves controversies over whether the corporate petitioner is entitled to deduct, as interest, payments which it made to the individual petitioners and whether the individual petitioners are entitled to treat payments which they received from the corporate petitioner as the return of principal of a loan. The answers depend upon whether an investment by the individuals in the corporation, in form a loan, is in substance a loan, or is instead an equity investment. The decision turns in part on the fair market value of property which the individuals transferred to the corporation.

### FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioner, Ambassador Apartments, Inc. (Ambassador), is a Connecticut corporation having its principal office in New Haven, Conn., and its principal place of business in Hartford, Conn., at the time the petition was filed in this case and at all times relevant to the issues herein. For the taxable years 1960 and 1961, Ambassador filed its Federal income tax returns with the district director of internal revenue, Hartford, Conn.

The petitioners, Louis and Rose Litoff (the Litoffs), are husband and wife, who maintained their legal residence in New Haven, Conn., at the time the petition was filed in this case. They filed a joint Federal income tax return for the taxable year 1960 with the district director of internal revenue, Hartford, Conn.

On or about September 30, 1958, the Litoffs purchased an apartment building and the land on which it was situated in Hartford, Conn., from the 206 Corp. The total purchase price, including adjustments for utility bills, unpaid rents, and certain furnishings, was $642,669.61. The Litoffs paid $198,573.64 in cash, gave the 206 Corp. a purchase-money note and third mortgage for $125,000, and took the property subject to a first mortgage with an unpaid principal balance of $244,095.97, held by Phoenix Mutual Life Insurance Co., and a second mortgage with an unpaid principal balance of $75,000, held by William Zachs. The cash was obtained from a bank loan to Louis Litoff. The 206 Corp. and the Litoffs were not related in any way, and the purchase was a bona fide arm's-length transaction. Neither at this time nor at any other time prior to 1964 did the Litoffs or Ambassador have an appraisal made of this property.

The property was located at 206–208–210 Farmington Avenue. Farmington Avenue begins close to the state capitol building in downtown Hartford and runs through a commercial and residential area in the city and on to the west. The property is located about a half

mile from the capitol and the railroad station in an area where land values rose between 1951 and 1959 as a result of urban redevelopment in Hartford and relocation of some of the city's business in the area of the apartment building. The property contained approximately 35,850 square feet, with 120-foot frontage on Farmington Avenue, and about 300-foot frontage on Jewell Court. The building on the property is a five-story brick apartment building containing twelve 4-room apartment units, sixty-five 3-room units, fifty-three 2½-room units, and three 1½-room units, for a total of 380 rooms and 133 units. All floors, including the basement, are served by three small old-type elevators; fire protection includes an emergency hose at each level; heat is supplied by a steam system with a Spencer type A-tube boiler with gun-type burner. The building was approximately 40 years old in September 1959, and although the method of construction used was obsolete in 1959, the building as it stood in 1959 was not itself obsolete, having an estimated remaining useful life of more than 50 years with proper maintenance. The property contained no parking facilities for the tenants.

For almost a year after purchasing the property, the Litoffs operated it in unincorporated form. On September 1, 1959, the balance sheet of the business was as follows:

Assets:

| | | |
|---|---:|---:|
| Cash in bank | | $4, 426. 77 |
| Buildings and improvements | $543, 115. 29 | |
| Land | 109, 769. 00 | |
| Equipment—ranges and refrigerators | 2, 275. 99 | |
| Office equipment | 154. 99 | |
| | 655, 315. 27 | |
| Depreciation-buildings and equipment | 12, 854. 77 | 642, 460. 50 |
| Unexpired insurance | | 1, 300. 00 |
| Total assets | | 648, 187. 27 |

Liabilities:

| | | |
|---|---:|---:|
| Accounts payable | | 3, 070. 08 |
| Municipal taxes: | | |
| 1958 list | 9, 728. 92 | |
| 1959 list—8 months | 12, 971. 92 | 22, 700. 84 |
| Mortgage interest accrued—July and August | | 2, 512. 50 |
| Payroll taxes | | 71. 55 |
| Mortgages payable: | | |
| First | 233, 999. 41 | |
| Second | 75, 000. 00 | |
| Third | 112, 321. 33 | 421, 320. 74 |
| Total liabilities | | 449, 675. 71 |

Net worth and/or equity:

Balance Jan. 1, 1959_____ $175, 115. 06

Estimated profit:

January 1 to August 31_____ 23, 396. 50

Total equity_____ $198, 511. 56

Total liabilities and equity_____ 648, 187. 27

On September 1, 1959, the Litoffs formed Ambassador Apartments, Inc., with an authorized capital stock of 5,000 shares of common stock with no-par value. On September 3, 1959, the Litoffs transferred the apartment building, land, and business to the corporation in exchange for Ambassador's note in the amount of $193,511.56 payable to them jointly or to the survivor, secured by a fourth mortgage on the property, and 25 shares each of Ambassador's stock with a total stated value of $5,000. The note provided for monthly payments of $1,000, plus interest on the unpaid balance, for 120 consecutive months, the balance due at the end of the 120-month period, September 3, 1969. The property transferred (net of cash and unexpired insurance) had a fair market value equal to its book value less accumulated depreciation on September 3, 1959, of $642,460.50, and the fair market value of the equity, as represented by the stock issued, equaled its stated value of $5,000.

Pursuant to a special meeting of stockholders on September 15, 1960, the Litoffs advanced the sum of $75,000 to Ambassador in order to discharge the second mortgage in advance of the January 2, 1961, due date. Ambassador issued to the Litoffs its unsecured promissory note in the amount of $75,000, bearing 5-percent interest and payable on demand. To the date of the hearing in this case, Ambassador has made no payments on this note.

In 1959, Ambassador made three principal payments to the Litoffs on the fourth mortgage note totaling $3,511.56. In 1960, it made 9 out of the 12 monthly $1,000 principal payments required by the note, totaling $9,000, no payments being made for the months of February, March, and April. The Litoffs never took legal action against Ambassador to enforce their rights with respect to these defaulted payments, although the note provided that on failure by the corporation to make a payment, the entire balance would come due immediately. In January 1961, the corporation made one principal payment of $1,000. Pursuant to a special meeting of Ambassador's shareholders and directors held February 3, 1961, Ambassador and the Litoffs entered into an agreement modifying the terms of the fourth mortgage and note. At that date, the principal unpaid balance of this mortgage was $180,000. Under the modification, Ambassador was not required to make further

payments of principal until February 3, 1966, when the entire sum remaining unpaid would be due and payable. Monthly interest payments at 6 percent per year were to continue. Since January 1961 to the date of the hearing in this case, March 14, 1967, Ambassador has made no principal payments with respect to the fourth mortgage note.

At all relevant times, Ambassador carried fire and liability insurance.

Ambassador has never paid a formal dividend. In 1960 and 1961, it paid to the Litoffs the sums of $11,205 and $10,805, respectively, as interest on the fourth mortgage note and claimed deductions therefor on its income tax returns for those years. The Litoffs treated these amounts as interest income on their tax returns for those years. They did not return as income the $9,000 received from Ambassador in 1960 and the $1,000 received in 1961 as principal payments on the fourth mortgage note, on the ground that such payments represented a return of capital.

OPINION

This case raises once again the question whether a shareholder's investment in his corporation, in form a debt, is a debt in substance, with the tax attributes and consequences of debt. The corporate petitioner, Ambassador, claims a deduction under section 163(a)[1] of the Internal Revenue Code of 1954,[2] for alleged interest paid to its sole shareholders. The individual petitioners, the Litoffs, seek to exclude from their gross income, as a tax-free return of capital, principal payments which they received from Ambassador on the purported debt. The respondent argues that the purported debt is in fact an equity investment by the Litoffs in Ambassador and that the distributions made by Ambassador to the Litoffs were dividends under section 316(a),[3] not

---

[1] SEC. 163. INTEREST.

(a) GENERAL RULE.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness.

[2] All statutory references are to the Internal Revenue Code of 1954.

[3] SEC. 316. DIVIDEND DEFINED.

(a) GENERAL RULE.—For purposes of this subtitle, the term "dividend" means any distribution of property made by a corporation to its shareholders—

(1) out of its earnings and profits accumulated after February 28, 1913, or

(2) out of its earnings and profits of the taxable year (computed as of the close of the taxable year without diminution by reason of any distributions made during the taxable year), without regard to the amount of the earnings and profits at the time the distribution was made.

Except as otherwise provided in this subtitle, every distribution is made out of earnings and profits to the extent thereof, and from the most recently accumulated earnings and profits. To the extent that any distribution is, under any provision of this subchapter, treated as a distribution of property to which section 301 applies, such distribution shall be treated as a distribution of property for purposes of this subsection.

deductible by Ambassador and taxable to the Litoffs under section 301 (a) and (c) (1).[4]

In cases involving the issue whether an investment is debt or equity, it is sometimes said that the court should not substitute its judgment for that of the investors. Although this expression is used merely as a shorthand means of saying that a court should accept the corporate capital structure established by the taxpayers, its use may obscure the role which the court does and should perform in such cases. The Court must decide what are the tax consequences of the investment in question. Obviously, our decision should not be based merely upon something so tenuous as the form and words used by the investor and the corporation. Our decision must be based upon more solid stuff—the substance of the transaction. We must look at its form to see whether it appears to be a debt or a capital contribution; and we must examine the surrounding circumstances to see whether they are consistent with the form of the transaction. Our primary concern is with the situation existing at the time the "debt" was incurred (*Affiliated Research, Inc.* v. *United States*, 351 F. 2d 646 (Ct. Cl. 1965)), although the parties' subsequent treatment of it is relevant in determining its substance. An investor may have the tax consequences applicable to a debt, if he has in fact created one. Though we have no desire to substitute our judgment for that of the investor, our decision must be based upon substance, and to that end, we undertake to ascertain what was really done. *Nassau Lens Co.* v. *Commissioner*, 308 F. 2d 39 (C.A. 2, 1962).

The respondent's position is that the fourth mortgage note in substance represented equity rather than debt, because at the time of the transfer of the property to it, the corporation was thinly capitalized, with a long-term debt to equity ratio of 123 to 1 and because the parties did not treat the note as debt. The petitioners' position rests almost entirely on the contention that Ambassador was not thinly capitalized when the property was transferred to the corporation and the fourth mortgage was created, because the fair market value of Ambassador's contributed capital exceeded its book value. They correctly argue that for purposes of determining capitalization, the fair market value of the equity interest, rather than book value, is con-

---

[4] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

    \*        \*        \*        \*        \*        \*        \*

(c) AMOUNT TAXABLE.—In the case of a distribution to which subsection (a) applies—

(1) AMOUNT CONSTITUTING DIVIDEND.—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

trolling. E.g., *Ainslie Perrault*, 25 T.C. 439 (1955); *Sheldon Tauber*, 24 T.C. 179 (1955). They then argue that although the building and land had a book value of $642,460.50 [5] at the date of transfer, it had a fair market value of $810,000 on that date. Therefore, they say, the corporation had capital of $172,000 in September 1959, which constituted adequate capitalization for the corporation.

The evidence, however, does not support the petitioners' factual contention; we have instead found that the fair market value of the property transferred to the corporation (other than cash and prepaid expenses) equaled its book value, approximately $642,000, so that the fair market value of the equity in the corporation equaled its book value of $5,000. Since the petitioners have the burden of proving that the respondent's proposed deficiency is incorrect, they have the burden of showing that the fair market value of the equity exceeded its book value. *Joseph S. Wells Ass'n* v. *Helvering*, 71 F.2d 977 (C.A.D.C. 1934); Rule 32, Tax Court Rules of Practice.

The petitioners rely principally upon an appraisal made at their request in 1964 to determine the value of the property as of September 1959. This appraisal determined the property to have had a fair market value of $810,000 at that time, by applying two approaches to valuation—the income capitalization approach and the comparable sales approach.[6] By using the comparable sales approach, the appraiser determined the fair market value of the property to be $815,000. However, we are not convinced by that evidence. All the comparable sales that he used occurred in 1958—about the same time as the purchase by the Litoffs. We think that the amount paid by the Litoffs for the property in question is much more reliable evidence of its fair market value than the use of information concerning other sales. The Litoff's purchase was at arm's length and bona fide, and although Mr. Litoff apparently thought the property was worth more than he paid for it, his opinion appears to be based more on hope than on solid knowledge. Thus, we have no reason to believe that the Litoff's purchase was for an amount other than the fair market value of the property. On the other hand, whenever a valuation is based upon the prices of comparable sales, it is necessary to make some adjustments for the differences in the comparable sales; there will always

---

[5] The petitioners explain the discrepancy between book value and the claimed market value by pointing out that since the property was transferred in a sec. 351 transaction the corporation took the transferors' basis, so that it was proper to show the transferred property on the corporate books at the Litoff's cost less depreciation rather than at fair market value. We think this is a reasonable explanation and have drawn no contrary inferences from the fact that the books show a "cost" to the corporation less than the claimed market value.

[6] The petitioners' appraiser and the respondent's appraiser agreed that the replacement cost approach to valuation was inappropriate because the method of construction of the building was obsolete in 1959.

be some differences for which adjustments must be made. How much the price should be adjusted upward or downward for each of the differences requires the exercise of some judgment and some speculation. In this case, the appraiser admitted that he lacked complete knowledge about the conditions of the comparable sales used by him. At times, valuations must be based upon comparable sales, but when there was an arm's-length sale of the property to be valued, such a sale provides much more reliable evidence of the fair market value of the property.

In his determination of fair market value based upon capitalization of the income, the petitioners' witness used income and expense figures ascertained from comparable apartments in the Hartford vicinity. Again, we are not persuaded by this computation, for we believe that a computation based on the actual income and expenses of the property to be valued is more reliable. At the trial, the witness computed values of $697,500 and $694,500 by capitalizing the actual net income of the property for the years 1960 and 1961 and by using a capitalization rate of 9 percent. In making this computation, though, the witness omitted some of the expenses that we believe should have been included, such as the payroll taxes and the costs of bookkeeping. Furthermore, we think that a 9-percent capitalization rate is somewhat low. The witness used 9 percent to furnish a 6-percent return on the investment and a recovery of capital at the rate of 3 percent. Yet, it appears that the interest rate on bank loans in Hartford at that time was between 5 and 6 percent, and since the rate of return on an investment like this should include some factor for the risk involved, it seems clear that a 6-percent return on investment is inadequate; it should be increased at least to 7 percent,[7] which with a 3-percent capital recovery factor yields a capitalization rate of 10 percent. If a value is determined by using the actual average income for the years 1960 and 1961, the actual average expenses for those years, an imputed management fee of 3 percent, and a capitalization rate of 10 percent, the value of the property so determined is less than its book value. Accordingly, the testimony of this witness failed to establish that the fair market value of the property exceeded its book value.

The petitioners contend that the value of the property increased by $167,000 (26 percent) between September 30, 1958, and September 3, 1959. To explain this dramatic rise, they offered testimony that the apartment building was located in an area where real estate values

[7] The appraiser who appeared for the respondent argued that the apartment building should yield a rate of return of 8 percent on its value (in addition to a 4-percent return of capital) and the underlying land should yield 6 percent on its value. If the 8-percent and 6-percent figures are reduced to a single, composite required rate of return, using the relative values of the land and building urged by either the petitioner or the respondent, the resulting required rate of return is substantially in excess of 7 percent.

generally rose greatly between 1950 and 1959, and where demand for residential housing, particularly apartment housing, had increased as a result of businesses relocating in the area. There is, however, no evidence in the record as to how great the rise in value was over this 9-year period or how much of this increase took place between September 1958 and September 1959. The testimony is too vague and too general to explain the claimed increase in value, and we are not convinced.

The record in this case contains two valuations of property made by an insurance company, but since we do not know the reasons those valuations were made and the circumstances surrounding them, we have not taken them into consideration in reaching our conclusion as to the value of the property. The record also includes information about the 1951 and 1961 values of the property used for purposes of local taxation, but since these valuations are somewhat remote in time, and since we have very little information as to their significance, we have given only slight weight to them. Similarly, we have given little weight to the fact that the deed transferring the property from the Litoffs to Ambassador bears Federal tax stamps which indicate that the property was treated as having a value of $640,000. We do not question the petitioners' claim that in connection with that transaction no determination of the property's fair market value was made, and that the amount of the stamps was fixed on the basis of the consideration recited in the corporate minutes.

After examining all the evidence concerning the fair market value of the property, we find that the arm's-length sale price in 1958 is the best evidence of its value. The petitioners' evidence attempting to show a higher fair market value in 1959 is not as reliable, and therefore, we have based our finding on the 1958 sales price.

Our inquiry then turns to the question whether, on the facts as we have found them, the fourth mortgage note in substance represents debt rather than equity. When the Litoffs transferred the property to the corporation, did they establish a creditor's as well as a shareholder's relationship to the corporation? The note when issued had all the formal indicia of "classic debt"—a promise to pay a sum certain by a reasonably close fixed maturity date, with provision for amortization of principal, and with a fixed percentage of interest payable without regard to the debtor's income or lack thereof. Even though the investment is in form a debt, the surrounding circumstances must still be examined to determine whether it was a debt in substance. *Nassau Lens Co.* v. *Commissioner, supra; 2554–58 Creston Corp.,* 40 T.C. 932 (1963); *Gooding Amusement Co.,* 23 T.C. 408 (1954), affd. 236 F. 2d 159 (C.A. 6, 1956), certiorari denied 352 U.S. 1031 (1957).

It is significant that the purported debt was held by the stockholders in the same proportion as the stock. When the purported debt is not

held in the same proportion as the stock, such fact is cogent evidence that the obligation is a debt. *Charles E. Curry*, 43 T.C. 667 (1965); *Leach Corporation*, 30 T.C. 563 (1958). Cf. *Baker Commodities, Inc.*, 48 T.C. 374 (1967). On the other hand, when the stockholders do hold the purported debt proportionately, such fact supports a finding that the "debt" in fact represents an equity interest (*2554-58 Creston Corp.*, *supra; Gooding Amusement Co., supra; Isidor Dobkin*, 15 T.C. 31 (1950), affirmed per curiam 192 F. 2d 392 (C.A. 2, 1951)), although it is not conclusive. *Ainslie Perrault, supra*. The other circumstances must be examined to learn what was the substance of the transaction. *2554-58 Creston Corp., supra.*

Here the lack of economic reality of the purported debt is apparent by reason of several circumstances. First, the debt-to-equity ratio of approximately 123 to 1 is, we think, totally unrealistic. *2554-58 Creston Corp., supra; Isidor Dobkin, supra*. We cannot believe that a creditor would lend almost $200,000 on security which was worth approximately $642,000 but which was already subject to prior liens of about $440,000. The security for the loan is quite inadequate. A decline in the value of the property of only $5,000, or 0.8 percent, would render the security insufficient to cover the debt. Furthermore, the testimony indicates that the property was an old building and that although it could be productive for many years, substantial capital improvements would have to be made in order to maintain its income-producing capacity. Thus, to maintain even the slight security that existed at the time of the loan, substantial additional capital would have to be provided.

In addition, the property was so heavily burdened with mortgages that the Litoffs could not reasonably have expected their "note" to be paid off in accordance with its terms. According to the tax returns, Ambassador had net income of approximately $56,000 in 1960, and $45,000 in 1961, without any allowance for depreciation. These amounts could be used to meet the corporation's obligations under the mortgages, but under the four mortgages, it was required to pay approximately $63,000 each year as interest and installments of principal. Even these payments were not enough to repay fully the mortgages, for the first and third mortgages required balloon payments to be made when they matured. Moreover, the second mortgage did not require any installment payments of principal; instead, the entire unpaid balance of $75,000 became due upon maturity in 1961. In fact, when it became due, the corporation was unable to make the payment, and the Litoffs had to advance an additional $75,000 to the corporation. These facts make clear that although the fourth mortgage of the Litoffs had terms purporting to require repayment at definite times, they could not reasonably expect it to be repaid at such times. Because of the

heavy obligations of the corporation and the lack of sufficient funds to meet them all, it must have been apparent to the Litoffs from the outset that they would have to subordinate their claim to that of the prior mortgagees. The prospect that shareholder-held "debt" will have to be subordinated to the debt of outside creditors is one of the principal indicia that the challenged investment is in substance an equity interest. *2554–58 Creston Corp., supra; Gooding Amusement Co., supra.*

Another indication that the purported debt lacked substance appears from the conduct of the parties to the obligation. The corporation failed to make some of the required payments in 1960, but nevertheless, the Litoffs did not attempt to enforce their rights to collect such payments. In addition, in 1961, the corporation and the Litoffs agreed to a modification of the obligation eliminating the requirement for amortization of the principal of the so-called debt. Although the modification accelerated the time when the "debt" was to become due, that time has now passed, and the evidence which we have indicates that no payments of principal have been made on the obligation. Thus, by their conduct, the parties have not treated the obligation as one involving a fixed duty to repay the principal. Admittedly, parties dealing at arm's length may agree to similar modifications of a debt, but the Litoff's willingness to alter the apparent obligation to repay the principal is another circumstance indicating that in substance the investment was not a debt. *Gooding Amusement Co., supra.*

In *Piedmont Corp.* v. *Commissioner*, 388 F. 2d 886 (C.A. 4, 1968), reversing a Memorandum Opinion of this Court, and in *Sun Properties* v. *United States*, 220 F. 2d 171 (C.A. 5, 1955), investments in the form of debt have been treated as such for tax purposes, despite the thin capitalization and heavy indebtedness of the corporations. Yet, we think that these cases are distinguishable. In *Piedmont*, the Court of Appeals apparently considered that the prospects of success of the enterprise were so good that the purported debt should be treated as debt in spite of the small amount of equity in the corporation. In *Sun Properties*, although there was little equity and much debt, the property transferred to the corporation had an established earning capacity, and its earnings were sufficient to meet the obligations under all the debts.

In support of their position, the petitioners argue that the Litoffs had a sound business purpose for making the major part of their investment in the form of secured debt. In the event of some catastrophe subjecting Ambassador to tort liability to third parties, the Litoffs' claim to the corporation's assets would, they say, be superior to those of unsecured tort creditors. However, we are not presented with

enough evidence to evaluate the validity of this contention. Ambassador carried fire and liability insurance; but there was no evidence as to the amount of such insurance, and no evidence to indicate the likelihood of Ambassador's incurring liability in excess of that insurance coverage. Thus, the fact of a business purpose was not established, and we need make no inquiry as to what relevance, if any, such a purpose would have to the question before us. See *Gooding Amusement Co., supra* at 420.

In deciding whether the arrangement between the Litoffs and Ambassador is to have the tax consequences of a debt or an investment in equity, it seems apparent that although the arrangement was in form a debt, it lacked the substance of a debt. Therefore, we hold that the so-called interest payments by Ambassador are not deductible, and that the distributions received by the Litoffs were in the nature of dividends. Accordingly,

*Decisions will be entered for the respondent.*