ALFRED RICE and PEARL RICE, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Rice v. Commissioner
Docket Nos. 4808-72, 4809-72, 5057-72, 5058-72, 5059-72, 5060-72.
United States Tax Court
T.C. Memo 1979-249; 1979 Tax Ct. Memo LEXIS 277; 38 T.C.M. (CCH) 990; T.C.M. (RIA) 79249; June 28, 1979, Filed *277 Held, Ps failed to carry their burden of proving that the Commissioner erred in his determination of the fair market value of property donated to a charitable organization.Held, further, Ps are liable for the additions to tax under sec. 6653(a), I.R.C. 1954, because part of the underpayments of tax for each of the years in issue was due to negligence or intentional disregard of the applicable rules and regulations. Maurice C. Greenbaum,Laurence Vogel, and Jonathan M. Harris, for the petitioners. H. Stephen *278 Kesselman, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The Commissioner determined the following deficiencies in, and additions to, the petitioners' Federal income taxes: Addition to Tax
Sec. 6653(a)
Petitioner
Year
Deficiency
I.R.C. 1954 [2]
Alfred Rice and
1966
$16,236.96 $ 811.85
Pearl Rice
1967
10,852.59
542.64
1968
11,051.32
552.57
Mary Hemingway
1966
37,265.46
1,863.27
1967
50,218.40
2,510.92
1968
37,479.57
1,873.98
Lila Werner and
1966
7,751.00
387.55
William J.
1967
19,387.87
969.39
Werner
1968
17,782.04
889.10
1969
3,404.76
170.24
Estate of Maurice
1966
29,387.27
1,469.36
Urdang, Leonore
1967
54,644.30
2,732.22
Urdang, Execu-
1968
46,003.00
2,300.00
trix, and
1969
48,667.53
2,433.38
Leonore Urdang
Joseph Abrams
1966
4,569.00
228.45
and Mildred
1967
8,198.00
409.90
Abrams
1968
12,947.00
647.00
1969
14,264.39
713.22
The parties have settled most of the issues. The issues remaining for *279 decision are: (1) What was the fair market value of certain property contributed by the petitioners to the Hospital for Joint Diseases on the date of such contribution; and (2) if there was an underpayment of tax for each year, whether any part thereof was due to negligence or intentional disregard of rules and regulations, within the meaning of section 6653(a). FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Alfred Rice and Pearl Rice (husband and wife), Mary Hemingway, Maurice Urdang and Leonore Urdang (husband and wife), William J. Werner, Lila Werner, and Joseph Abrams and Mildred Abrams (husband and wife), maintained their legal residences in New York, N.Y., at the time they filed their petitions in this case. All the petitioners filed their Federal income tax returns for the years in issue with the District Director of Internal Revenue for the District of Manhattan, N.Y. Since the filing of the petition, Mr. Urdang has died, and his estate has been substituted as a party. Although Mr. and Mrs. Werner filed joint Federal income tax returns for the years in issue and received a joint notice of deficiency, each of *280 them has filed a separate petition. Alfred Rice, Mary Hemingway, Maurice Urdang, William Werner, Lila Werner, and Joseph Abrams will sometimes be referred to as the petitioners. During 1972, Smith-Corona Marchant, Inc. (SCM), acquired title to a 71.7-acre tract in Orangeburg, S.C., and thereafter, it substantially improved the tract so that by March 1, 1963, its total investment in the 71.7-acre tract as improved (the property) was as follows: Calculator building
$1,752,853
Warehouse-type shell building
363,863
Machinery
368,924
Land improvements
39,311
Land cost
64,500
Total investment
$2,589,451
In early 1963, SCM conveyed title to the property to Wrexham Properties, Inc. (Wrexham), and at or about the same time: (1) Wrexham and SCM entered into a lease (the lease); (2) Wrexham mortgaged the property by executing an "Indenture of Mortgage and Deed of Trust" (the indenture); and (3) Wrexham and the trustee under the indenture executed an "Assignment of Lease and Agreement" (the assignment). Under the lease between SCM as leassee and Wrexham as lessor, there was an "Interim Term," which commenced on March 1, 1963, and ended on March 31, 1963, and *281 a "Primary Term," which commenced on April 1, 1963, and ended on March 31, 1983. The rent for the interim term was $12,396, and the rent for the primary term was $211,860 a year for the first 6 years and $212,172 a year for the remaining 14 years. The annual rent was to be paid in four equal quarterly installments, due on the last day of March, June, September, and December. In addition, SCM was granted the option to extend the lease in its discretion for up to six "Extended Terms" of 5 years apiece under the same basic terms and conditions as prevailed during the primary term, except that the annual rent for each year of an extended term was $62,500 payable in quarterly installments. Upon appropriate notice, SCM could terminate the lease at any time after April 1, 1973, provided that it included with the notice of termination an irrevocable offer to purchase the property at a price equal to the approximate outstanding balance of the notes plus, in some cases, $150,000. Rejection of such an offer would result in the termination of the lease. The lessee was also allowed to assign and sublet its interest in the lease. In contemplation of the indenture, Wrexham issued five mortgage *282 notes. Four of the notes bore interest at 6 percent and matured in 1983, and one of the notes bore interest at 5-3/4 percent and matured in 1969. Under the indenture, Wrexham agreed to, inter alia, the following terms and conditions: (1) Wrexham was to lease the property to SCM or its successor or assignee during the term of the mortgage. Wrexham also agreed to charge rent to cover the quarterly principal and interest payments under the indenture. From 1963 through 1968, the average annual mortgage payment was to be $207,336. From 1969 to 1983, the average annual payment was to be $210,704. (2) The trustee was authorized to act as Wrexham's agent in the collection of all rents and other moneys required to be paid under the lease. (3) Wrexham could not prepay the notes prior to April 1, 1973. Thereafter, Wrexham was permitted to prepay the outstanding notes, at its option, at a price equal to 100 percent of the unpaid balance of such notes plus accrued and unpaid interest and a premium equal to the following percentages of the unpaid principal amount: If Prepaid During
12-Month Period
Ending With
Percentage
3/31/74
6.0
3/31/75
5.4
3/31/76
4.8
3/31/77
4.2
3/31/78
3.6
3/31/79
3.0
3/31/80
2.4
3/31/81
1.8
3/31/82
1.2
3/31/83
0.6
*283 (4) If the 6-percent notes were held to maturity, Wrexham was required, in addition to making all payments of principal and interest, to pay the holders thereof an amount equal to approximately $400,000, or in lieu of such payment, Wrexham could transfer to the trustee for the benefit of the holders of such notes an undivided 50-percent interest in the property. (5) Wrexham could sell or otherwise transfer the property, provided the transferee agreed to be subject to the indenture and the assignment to the same extent as Wrexham. (6) If the lessee exercised its option under the lease to give Wrexham notice of its intention to terminate the lease together with a qualifying offer to purchase the property, Wrexham could either accept the offer or reject it. However, if the offer was rejected, Wrexham was required to pay the trustee an amount equal to approximately the outstanding principal of the notes plus the then value of the $400,000 payable at maturity, computed by discounting such amount at 6 percent annually. If the offer from the lessee to Wrexham was unacceptable to all of the note holders, they could preclude Wrexham from accepting such offer. In such case, Wrexham could *284 be released from the indenture by making the above payment to the trustee. The assignment provided, in relevant part, that in compliance with the provisions of the indenture, and as further security for the payment of all sums payable on the notes issued and to be issued under the indenture and for the performance of all its other obligations in the indenture, Wrexham assigned, transferred, conveyed, and set over to the trustee under the indenture all of Wrexham's estate, right, title, and interest in the property as lessor, including the immediate right to collect all rent, income, etc. Such assignment also provided that upon payment of all sums payable under the indenture and compliance with all of the terms of the indenture and assignment, the assignment and the rights granted to the trustee thereunder would terminate and the estate, right, title, and interest of Wrexham would revert to Wrexham. By deed recorded as of March 11, 1963, Wrexham conveyed title to the property to five individuals in the following shares: Purchaser
Interest
Mary Hemingway
50 percent
Maurice Urdang
35 percent
Alfred Rice
5 percent
Joseph Abrams
5 percent
Frank Zuckerbrot
5 percent
*285 They acquired the property subject to the lien of the indenture in the amount of $2,467,100, and the tax stamps on the deed indicated they paid a cash consideration of $125,000. They executed an assumption agreement pursuant to the indenture under which (1) they acknowledged the conveyance was subject to the lien of the indenture and the lease; (2) they appointed the trustee under the indenture as their agent and attorney in fact and authorized it to act as authorized by the indenture; and (3) they agreed to assume all of Wrexham's obligations under the indenture other than its obligation to pay the notes. The trustee was also informed that Wrexham's stock would be transferred to William J. Werner and that rentals in excess of the mortgage payments should be paid to the transferees in proportion to their interests. On May 7, 1963, Mr. and Mrs. Werner became directors and officers of Wrexham. Subsequent to March 1, 1963, Frank Zuckerbrot died. On June 2, 1966, Clair Zuckerbrot, sole devisee under his will, conveyed his 5-percent interest to Mr. and Mrs. Werner without consideration. On December 28, 1966, the petitioners executed a deed conveying their interests in the property *286 to the Hospital for Joint Diseases and Medical Center (the hospital) in New York, N.Y., as a charitable contribution. The petitioners claimed charitable contribution deductions on their Federal income tax returns for the years in issue based on their interests in the property. Mr. Werner, a tax attorney, valued such interests in the property, as follows: The law as I understand it was that the mortgage companies or life insurance companies or banks who furnished said mortgage would lend up to 65% of their appraised value of the property. On the presumption that the lending institutions lent up to the maximum of 65% and not below, I multiplied the approximate figure of 2 1/2 million dollars times 1 1/2 to give me what 100% of the value of the property would be. This is the formula that I used in obtaining the fair market value of the property at the time that the charitable contribution was made. Mr. Werner also allowed for appreciation in value from 1963 to 1966. Using such formula, Mr. Werner valued the property as of December 28, 1966, at $4,230,769.25, and after subtracting from such amount the outstanding mortgage of $2,171,032.58 and depreciation recapture of $121,517.51, *287 he determined the value of the charitable contribution was $1,938,219.16. Each of the petitioners used such value in claiming the charitable contribution deductions. On July 21, 1972, the hospital sold its interest in the property and the stock of Wrexham to Marchant Properties, Inc. (Marchant), a wholly owned subsidiary of SCM, for $115,000 in cash. Marchant took the property subject to the then outstanding mortgage indebtedness of $1,660,416. The hospital disposed of its interest in the property because it believed that continued ownership of the property might jeopardize its tax-exempt status. In August 1972, Marchant paid $1,695,775.80 to discharge the remaining indebtedness on the property. Such payment was computed as follows: Principal
$1,632,646.60
Interest
14,149.88
Penalties (3 percent of
outstanding principal
amount)
48,979.42
Total
$1,695,775.80 [3]
Thereafter, the property and the lease were entirely free and clear of the lien of the indenture. In August and September 1972, Marchant and *288 SCM sold the property, the leasehold, leasehold improvements, certain personal property, and some additional land to two unrelated third parties, Roper Corporation (Roper) and Wilbur B. Driver Company (Driver), for an aggregate consideration of $2,800,000. The parties to such sale allocated approximately $1,900,000 of the aggregate purchase price to Marchant's interest in the property which it had acquired from the hospital. The remainder of the purchase price was allocated to the additional land, the leasehold, the leasehold improvements, and personal property. For tax purposes, the buildings on the property were depreciated on the basis of a 37-year useful life. However, such buildings had a useful life of 50 years. The land improvements and machinery were depreciated on the basis of useful lives of 20 years and 12 years, respectively. In his notices of deficiency, the Commissioner determined that the petitioners were entitled to no charitable contribution deductions because the fair market value of their interests was less than the sum of the applicable depreciation recapture and the outstanding indebtedness on the property on the date of the gift. In addition, the Commissioner *289 determined that the petitioners were liable for the additions to tax under section 6653(a) because the underpayments of tax resulted from their negligence or intentional disregard of rules and regulations. The parties stipulated that under section 170(e), depreciation recapture of $200,000 must be deducted from the fair market value of the petitioners' interests in the property in order to determine the amount of the charitable contribution. OPINION The primary issue presented for decision is the fair market value of the petitioners' interests in the property on December 28, 1966, the date they donated it to the hospital. Generally, section 170 allows a deduction, subject to certain limitations, for charitable contributions made within the taxable year. If the contribution is made in property other than money, the amount of the deduction is equal to the fair market value of the property reduced by the sum of the outstanding liabilities on the property and the amount of depreciation required to be recaptured pursuant to section 170(e). Sec. 1.170-1(c), Income Tax Regs. *290 The parties have agreed that the property was subject to liabilities of $2,171,032.58, and that $200,000.00 of depreciation must be recaptured; therefore, the petitioners are entitled to a charitable contribution deduction only to the extent that the fair market value of the petitioners' interests in the property exceeded $2,371,032.58. Generally, the fair market value of property is the price at which a willing buyer will purchase it from a willing seller, when neither is acting under compulsion and both are fully informed of the relevant facts and circumstances. Bankers Trust Co. v. United States,207 Ct. Cl. 422, 518 F. 2d 1210, 1219 (1975), cert. denied 424 U.S. 966 (1976); Kimmelman v. Commissioner, 72 T.C.     (May 9, 1979); McShain v. Commissioner,71 T.C. 998 (1979). In his notices of deficiency, the Commissioner determined that the fair market value of the petitioners' interests in the property was less than $2,371,032.58. The Commissioner's *291 deficiency determinations are presumptively correct, and the petitioners bear the burden of proving a higher value. Rule 142, Tax Court Rules of Practice and Procedure; Welch v. Helvering,290 U.S. 111 (1933). At trial, both parties presented the testimony of expert witnesses to establish the fair market value of the petitioners' interests in the property. The petitioners' expert witness was president of a large international commercial and industrial real estate brokerage firm. Such company has acted as broker for many major national and international corporations, and such expert, in his capacity as president of such company, has been involved in the sale, leasing, acquisition, and development of industrial and commercial real estate, especially in the southeastern part of the United States. In his valuation report, the petitioners' expert generally used a market analysis to calculate the fair market value of the property. He ascertained the relevant characteristics of the property, the market conditions, new construction cost, and the cyclical nature of the textile industry. He also analyzed ten sales of other industrial and commercial real estate occurring *292 from 1972 to 1975 and considered them to be comparable to the property. He concluded that the buildings on the property encompassed approximately 341,273 square feet, and that a reasonable price per square foot was approximately $10. Accordingly, he valued the property at $3,400,000. At the trial, he also used a direct capitalization-of-earnings method to value the property at $3,476,800. In determining a capitalization rate of 6.16 percent, he allowed for a yearly depreciation factor of 1.66 percent and an interest rate of 4.50 percent. He used $212,000, approximately the annual rental payment during the primary term of the lease, as the income to be capitalized. The Commissioner's expert is also a highly qualified and experienced real estate appraiser. Since 1965, he has been engaged primarily as a valuation engineer either for the Government or in the private sector. He is a Registered Professional Engineer in several States and has been qualified as an expert witness in State and Federal courts on numerous occasions. In determining the fair market value, the Commissioner's expert inspected the property, analyzed the market conditions, considered prior and subsequent *293 transfers of the petitioners' interests in such property, and thoroughly analyzed the lease, the indenture, and the assignment. Based on such analysis, he valued the property using two methods: an annuity capitalization method and the reproduction cost method. Under the annuity capitalization approach, the Commissioner's expert first determined an appropriate capitalization rate. He noted that the prime interest rate, which was 4-1/2 percent in 1963, had risen to 6 percent by December 1966, and his analysis of the money markets revealed that it was common for first mortgages of the kind involved in this case to bear interest at a rate in excess of 7 percent. Taking into consideration these and other factors, he concluded that a capitalization rate of 7 percent was reasonable, even though he believed a higher rate would also be justified under the circumstances. Next, he computed the income to be capitalized. In his view, the lease and mortgage were of primary importance to such determination. Though the annual rental payments during the remaining 16 years of the primary term of the lease would be approximately $212,000, the hospital would only actually receive during such period *294 the amount by which the annual rental payments exceeded the mortgage payments. In addition, SCM could, at its option, extend the lease in 5-year terms through the year 2013 at annual rental payments of $62,500. However, the transferee of the petitioners' interests would be entitled to the full annual rental payments during the extended terms only if it paid the note holders $400,000 in 1983; otherwise, the note holders would be entitled to one-half of the annual rental payments during the extended terms of the lease. The Commissioner's expert assumed that SCM would exercise its option to extend the lease so long as the fair rental value of the property exceeded $62,500. If the fair rental value of the property declined to less than such amount and if SCM terminated the lease, the expected return to the owners of the petitioners' interests would also decline. Finally, he determined that the buildings on the property had a useful life of 50 years, notwithstanding that they had been depreciated for tax purposes on the basis of a 37-year useful life. With these factors in mind, he determined that the income to be capitalized should be the rental income from 1966 through 2013, adjusted *295 for the mortgage liability, payments required of the owner of the petitioners' interests or the reduction in interests if such payments are not made, and for the reversionary interest to the lessor at the termination of the lease. Accordingly, under this annuity capitalization approach, he determined the value of the property to be equal to the sum of (1) the present worth of the amount by which the rental payments exceeded the mortgage payments from the date of the gift to 1983, plus (2) either (a) the present worth of the full annual rental payments during the extended terms of the lease minus the present worth of $400,000 payable in 1983, or (b) the present worth of one-half of the annual rental payments during the extended terms of the lease, whichever is higher, plus (3) the present worth of the estimated reversionary value of the property, which, after the 50-year lease, would be the value of the land and the salvage value of the buildings, since they had a useful life of only 50 years. Such computations produced a fair market value for the petitioners' interests in the property which was less than the $200,000 depreciation recapture. Under the reproduction cost approach, *296 the Commissioner's expert first determined the original cost of the buildings and the other improvements on the property. Then, using various cost indexes for similar construction projects in the southeast, he determined the extent to which the cost of reproducing the same improvements had increased from 1962 to 1966. By multiplying the original cost of the improvements by a factor which reflected the average increase in such cost, by adding to such value $70,000 for the value of the land, and then by making appropriate adjustments to reflect depreciation in the improvements occurring from 1962 to 1966, he determined that the value of the property was $2,545,000. After reducing such value by the outstanding indebtedness, the $200,000 depreciation recapture, and the value of the leasehold interest, he concluded that the petitioners were not entitled to charitable contribution deductions. On brief, the Commissioner also computed the fair market value of the petitioners' interests in the property using a variation of his expert's annuity capitalization method. During the primary term of the lease, he substituted the present worth of the full rental payments unreduced by the annual *297 mortgage payments for the present worth of the excess rental payments. He left the remainder of his expert's computation intact. Under such alternative approach, it is necessary to reduce the resulting amount by the outstanding liabilities and the depreciation recapture, since neither of these were reflected in computing the present value of the anticipated income. This alternative computation also yielded a fair market value which was insufficient to produce charitable contribution deductions. After carefully evaluating all the evidence and the opinions of both experts, we are convinced that the conclusion of the petitioners' expert cannot withstand analysis. Notwithstanding his impressive credentials, both of his approaches to fair market value contain fatal defects. His market approach to valuation is defective because his "comparable" sales transactions, the heart of such method, are not comparable to the petitioners' interests in the property for the following reasons: (1) The "comparable" sales all occurred from 6 to 9 years after the applicable valuation date; (2) four of the "comparables" were constructed after 1970, and five were constructed from 1967 to 1969, whereas *298 improvements on the property were constructed in 1962-1963; (3) for the most part, the buildings on the property were twice as large as the buildings involved in the "comparables"; (4) in several instances, the square footage of the buildings on the "comparables" was grossly underestimated, thereby increasing the price per square foot; and (5) most importantly, there is absolutely no evidence that nine of the ten "comparables" were encumbered by a long-term lease, much less a long-term lease with such favorable terms for the lessee. One "comparable" was subject to a net 20-year lease; but such property, which was constructed in 1973, was sold in 1975 for $2.17 per square foot. The precise issue in this case involves determining the fair market value of the petitioners' interests in the property, which were severely limited by the terms of the lease, the indenture, and the assignment, and the petitioners' expert gave virtually no consideration to those restrictions.Accordingly, his market analysis is of little help in determining the fair market value of the petitioners' interests.
We are equally unimpressed with his capitalization-of-earnings analysis. First, the 6.16-percent capitalization *299 rate used by him was too low. Such rate was the sum of two components: an interest rate factor of 4.50 percent and a depreciation factor of 1.66 percent. He determined a 4.50-percent interest rate was appropriate because certain similar construction was financed by 4.50-percent tax exempt municipal bonds. However, the prime rate of interest in 1966 was 6 percent, and it was common for similar first mortgage financing to bear interest in excess of 7 percent. Though the interest rate on tax exempt bonds may have been 4.50 percent, such interest rate was possible only because the income was tax exempt, a situation not present with respect to the property. In any event, the interest rate on tax exempt bonds is only one factor to be considered in selecting a capitalization rate, not the sole factor. In addition, the evidence supports the use of a larger depreciation factor. He concluded that a depreciation factor of 1.66 percent was reasonable based on a useful life for the buildings of 60 years. However, for tax purposes, the machinery was depreciated on the basis of a 12-year useful life, the land improvements on the basis of a 20-year useful life, and the buildings on the basis *300 of a 37-year useful life. Though the actual useful lives of the machinery, the land improvements, and the buildings may exceed their tax useful lives, we believe that on the evidence, a depreciation factor based on a 50-year useful life was more reasonable. Second, the earnings capitalized by the petitioners' expert were far in excess of the income the property could reasonably be expected to produce. He used $212,000 as the income to be capitalized. However, under the lease, the annual rent was approximately $212,000 only until 1983, or for 16 years. Thereafter, the annual rent would be reduced to $62,500 for up to the next 30 years. The average annual rent over the possible 46 years remaining on the lease was $114,500, not $212,000. See Bryant Trust v. Commissioner,11 T.C. 374, 380 (1948). Using a capitalization rate of 7 percent and average annual rent of $114,500, the capitalization of such earnings would produce a value far less than the sum of the outstanding mortgage liabilities and the depreciation recapture. [4] Furthermore, since the owner of the petitioners' interests either must pay $400,000 in 1983 or forfeit an undivided one-half interest in the *301 rental payments under any and all extended terms of the lease, the average annual rent, and hence the income to be capitalized, must be adjusted downward to take such conditions into consideration. On the other hand, the analysis of the Commissioner's expert provides us with a fairly reliable estimate of the fair market value of the petitioners' interests in the property. Under his capitalization-of-earnings approach, he took into consideration that the terms and conditions of the lease have the effect of limiting the income-producing potential of the property to the designated rental payments, that the useful lives of the improvements on the property were 50 years or less, that at the expiration of the lease, there would be a nominal salvage value, and that as long as the lessor and lessee were not related parties, the lessee would not terminate the lease unless the fair rental value of the property declined to less than $62,500, in which case, the lessor's expected annual return would be less than *302 such amount. In addition, the Commissioner has demonstrated that in this case, it is irrelevant whether the mortgage payments are factored out of each rental payment or the total liability is subtracted from the fair market value after the rental payments have been capitalized. In either case, the value of the petitioners' interests in the property is inssufficient to support charitable contribution deductions. Under his reproduction cost analysis, the Commissioner's expert reaches a similar result. Though we recognize that such method is less reliable than other methods, especially where a long-term lease is involved, such analysis does lend support to the Commissioner's determination that the petitioners are not entitled to charitable contribution deductions. The conclusion of the Commissioner's expert is strongly corroborated and conformed by several other factors. On five separate occasions, the petitioners' interests in the property were transferred and hence valued by independent market factors; on each of such occasions, the price paid for or allocated to such interests is in line with the Commissioner's conclusion. In 1963, when Wrexham acquired such interest, it *303 assumed the outstanding liabilities but apparently paid no other consideration. Subsequently, in 1963, when four of the petitioners and Mr. Zuckerbrot acquired such property from Wrexham, they took the property subject to the outstanding liabilities and paid a cash consideration of only $125,000. In 1966, Clair Zuckerbrot, sole devisee under Mr. Zuckerbrot's will, conveyed a 5-percent interest in the property to the Werners without any consideration. In 1972, the hospital sold its interest in the property and the stock of Wrexham to Marchant for $115,000. Finally, in 1972, when Marchant and SCM conveyed their unencumbered lessor's and lessee's interests in the property, plus additional land, to Roper and Driver, only approximately $1,900,000 was allocated to the interest in the property which Marchant had acquired from the hospital. Such amount exceeded the mortgage which had just been discharged by only approximately $200,000. These transactions all involved the particular interests to be valued, and they reflect the market's valuation of such interests. Consequently, they represent persuasive evidence of the fair market value of those interests. See generally Ambassador Apartments, Inc. v. Commissioner,50 T.C. 236 (1968), *304 affd. per curiam 406 F.2d 288 (2d Cir. 1969). The petitioners argue that some of these transactions are not indicative of the fair market value of the property. For example, they point out that the sales to Roper and Driver were in 1972 and that the sale by the hospital was allegedly for less than fair market value. Yet, the sales to Roper and Driver were as close to the valuation date as those comparables used by the petitioners' expert, and though the hospital may have been anxious to sell its interests in the property, we cannot believe that, as a public charity, it would have disposed of such interests at a price significantly lower than the value. The petitioners also claim that the transfer from Mrs. Zuckerbrot to the Werners was a family transaction, but they introduced no evidence to support such claim. What is most significant is that between 1963 and 1972, the petitioners' interests in the property were valued on the open market in five separate transactions, and in none of such transactions were such interests valued at a price in excess of the outstanding or discharged indebtedness plus the $200,000 of depreciation to be recaptured. The petitioners *305 also raise three objections to the valuation approach employed by the Commissioner's expert, but there is no merit in such objections. First, they argue that they possessed certain "rights of ownership" with respect to the property which allowed them "to realize the full fair market value of the property at any time." However, such argument begs the question. Though it is true that the petitioners had several rights, including the right to sell their interests in the property, the right to terminate the lease upon default, the right to reject purchase offers, and the right to prepay the indebtedness in accordance with the terms of the indenture, the issue is not whether they possessed such rights, but how much would a willing buyer pay for their interests in the property which included such rights. Consequently, the petitioners' reliance on the Supreme Court's decision in Frank Lyons Co. v. United States,435 U.S. 561 (1978), is misplaced, since that case merely decided who was to be treated as the owner of the property for depreciation purposes. Second, the petitioners argue that we should accept their capitalization-of-earnings analysis rather than the Commissioner's *306 "annuity method." Both experts used capitalization-of-earnings approaches: The petitioners' expert used a so-called direct capitalization method, while the Commissioner's expert used an annuity capitalization method. The annuity capitalization method differs from the direct method primarily because it takes into consideration a compound interest factor, and because it distinguishes between returns on and returns of capital. See E. Friedman, Encyclopedia of Real Estate Appraising 41-62 (3d ed. 1978). Though the parties argue vigorously over which method is proper, it is not necessary for us to decide the issue; if the method of the petitioners' expert is properly applied--that is, a 7-percent capitalization rate is applied to a weighted average of the annual rental payments, it yields a fair market value which is similar to that determined by the Commissioner, and such value is insufficient to justify charitable contribution deductions. In addition, the petitioners' reliance on Honigman v. Commissioner,55 T.C. 1067 (1971), affd. 466 F. 2d 69 (6th Cir. 1972), and Gottlieb v. Commissioner,T.C. Memo. 1974-178, is misplaced. *307 Such cases merely decided the fair market value of the property at issue based on the evidence presented, which included a capitalization-of-earnings analysis by each party as well as other valuation methods; they did not hold that the capitalization-of-earnings methods used in those cases had to be used in all valuation cases. Similarly, Bryant Trust v. Commission,supra, does not require us to adopt the petitioners' valuation method. There, the petitioner had inherited property subject to a long-term lease under which the rentals in the first few years could be retained by the lessee to reimburse it for certain expenditures, and the issue involved the petitioner's basis in the property which under the applicable statutory provisions was the fair market value of the property on the date the devisor died. Citing Crane v. Commissioner,331 U.S. 1 (1947), the Court held that the petitioner's basis in the property equaled the fair market value of the property on the date of the devisor's death undiminished by the rent which the lessee was permitted to retain. Then, the Court proceeded to determine the fair market value of the property. Absent *308 the lease, the property had a fair market value of around $1 million, but because the lease limited the income from the property to the rental payments under the lease, the average annual rental payment over the term of the lease was capitalized to produce a value of approximately $530,000. Clearly, such case not only fails to support the petitioners' argument, but it supports the Commissioner's contention that the effect of the lease on the value of the petitioners' interests in the property must be considered. Third, the petitioners argue that section 1.170-1(d)(1), Income Tax Regs., requires the Commissioner to use a capitalization rate of 3-1/2 percent, since he is using an annuity capitalization method to value their interests. There is no merit in such argument. Section 1.170-1(d)(1) provides: (d) Transfers of income and future interest--(1) In general. A deduction may be allowed for a contribution of an interest in the income from property or an interest in the remainder * * *. The income or remainder interest shall be valued according to the tables *309 referred to in paragraph (d) of § 1.170-2. * * * The "tables referred to in paragraph (d) of § 1.170-2" are the tables in section 20.2031-7, Estate Tax Regs., which compute the present worth at 3-1/2 percent interest, compounded annually, of constant periodic payments over a designated number of years. By their own terms, such regulations apply only where the specific interest involved is an income or remainder interest. In such cases, the regulations specify which method is to be used to value the interest and how such method is to be applied. However, here, the petitioners owned the property and they trnasferred such ownership interests, and not an income or remainder interest, to the hospital. Under these circumstances, the regulations place no restrictions on the methods to be used to value such interests; they only require that the fair market value of such interests be ascertained. To obtain such fair market value, the parties used various capitalization-of-earnings, market, and reproduction cost methods. Even though one of such methods, the annuity capitalization method, was similar to the method the regulations require to be used to value income and remainder interests, *310 the Commissioner is not thereby required to use the capitalization rate specified by such regulations. Moreover, the 3-1/2 percent discount rate in such tables only considers the interest income which the annuitant must forego because he does not have the immediate use of the income stream. Yet, the capitalization rate which is appropriate in this case must take into consideration alternative investments, the risk factor, and the fact that a portion of the periodic payments represents a return of capital in addition to a return on capital. In conclusion, we hold that based on the evidence presented, the petitioners have failed to carry their burden of proving that the Commissioner erred in determining that the fair market value of their interests in the property did not exceed the sum of the outstanding indebtedness at the time of the gift plus the $200,000 depreciation recapture. The second issue for decision is whether any part of the petitioners' underpayment of tax for each of the years in issue was due to negligence or intentional disregard of rules and regulations within the meaning of section 6653(a). *311 The petitioners also have the burden of proof on this issue. Vaira v. Commissioner,444 F. 2d 770 (3d Cir. 1971), affg. on this issue 52 T.C. 986 (1969); Rosano v. Commissioner,46 T.C. 681 (1966).To meet such burden, they argue only that the method used by Mr. Warner to compute the value of their interests in the property was reasonable. We disagree. To value the property, Mr. Werner, a tax attorney, contacted a national brokerage firm in New York. He asked someone at such firm if there was a general rule for valuing mortgaged property, and he was informed that financial institutions in many instances will not lend more than 65 percent of the appraised value of the property. Using such information, Mr. Werner simply multiplied the cost of constructing the improvements by 150 percent, and he increased such amount to reflect 3 years of appreciation in value, resulting in a total value of approximately $4,200,000 for the property. In our view, such method of valuing the property was at the very least negligent. Mr. Werner is apparently an experienced tax attorney, who must have been aware of the importance of a bona fide estimate *312 of fair market value, and who was intimately involved in the various negotiations and transactions involving the property. He was aware of how much it cost to build the improvements on the property; he was aware of how much Wrexham paid for such property; he was aware of how much the petitioners paid for their interests in the property; and he was aware of the substantial tax benefits to be derived from placing a high value on the property. As a professional man intimately familiar with all such transactions, Mr. Werner must have realized that his method of computing value was not at all reliable. Insofar as the record discloses, he did not reveal to the spokesman at the brokerage firm any information concerning the terms and conditions of the lease, the indenture, and the assignment to which the property was subject.As an experienced attorney, he must have been aware that the general observation of the spokesman was not relevant to financing transactions of this type and that in many such transactions, the amounts lent exceed 65 percent of the value.Moreover, he had no knowledge that any such limit was in effect in South Carolina. Nor can the other petitioners escape responsibility *313 for their conduct by claiming that they relied on Mr. Werner. Though he is an attorney, he was not, so far as this record reveals, acting as an attorney for them at that time, and they have not claimed that they relied upon him as their attorney in such matter. They relied upon his determination of value, and they must bear the consequences of his action. Moreover, the result of Mr. Werner's computation of value was that the petitioners' interests in the property increased in value more than ten times in a period of about 4 years; though such a rapid increase in value was not unprecedented in those times, it was unusual, and it should have caused the petitioners to question Mr. Werner's results. On the basis of this record, we hold that the petitioners have failed to carry their burden of showing that the underpayments of tax were not due to negligence or the intentional disregard of rules and regulations. Decisions will be entered under Rule 155.
Footnotes
1. Cases of the following petitioners are consolidated herewith: Mary Hemingway, docket No. 4809-72; Lila Werner, docket No. 5057-72; Estate of Maurice Urdang, Leonore Urdang, Executrix, and Leonore Urdang, docket No. 5058-72; William J. Werner, docket No. 5059-72; and Joseph Abrams and Mildred Abrams, docket No. 5060-72.↩
2. All statutory references are to the Internal Revenue Code of 1954 as in effect during the years in issue.↩
3. The parties stipulated to the total amount paid and as to the component parts of such total. However, these figures add up to $1,695,775.90↩
4. Using a capitalization rate of 7 percent, average annual rent would have to exceed $165,000 before the petitioners would be entitled to charitable contribution deductions.↩