T.C. Memo. 2000-177


UNITED STATES TAX COURT


EDWARD L. PROVOST AND VICKY L. PROVOST, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3936-97.                        Filed May 26, 2000.


<u>Terrence J. Moore</u>, for petitioners.

<u>Lisa N. Primavera</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

MARVEL, <u>Judge</u>:  Respondent determined a deficiency in petitioners' 1993 Federal income tax of $68,083 and an accuracy-related penalty of $13,617 under section 6662(a).[1]

_____

[1]All section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.  Monetary amounts are rounded to the nearest dollar.

The issues for decision are: (1) Whether petitioners' advance of $200,000 to Richard Magness is deductible as a business bad debt under section 166 and (2) whether petitioners are liable for an accuracy-related penalty under section 6662(a). We hold that the advance is not deductible as a business bad debt and that petitioners are liable for the accuracy-related penalty.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts is incorporated herein by this reference.

Petitioners are married and resided in Dana Point, California, at the time the petition was filed. Unless otherwise indicated, "petitioner" refers to Edward L. Provost.

Petitioner is a business consultant who, during 1993, also held a real estate license. Prior to 1987, petitioner worked as an executive in a transportation company called Industrial Freight System (IFS).[2] His employment at IFS ended in or about 1987, at which point he became a consultant to IFS. Petitioner was not in the business of lending money in 1993.

Although petitioner received income from other sources, the majority of his income from 1988 through 1991 was received from consulting services. These services were performed almost

_____

[2]At one time, petitioner owned a 40-percent interest in the corporation.

exclusively for IFS. In 1992, petitioner reported income of $20,000 from his consulting activities, and from 1993 through 1995, he reported no income from consulting activities.

In or about 1977, petitioner became acquainted with Richard Magness, a licensed framing contractor. Petitioner hired Mr. Magness to perform framing work on two spec houses[3] petitioner was building, one in Sherman Oaks and one in Los Angeles. Petitioner also hired Mr. Magness to perform framing work for the construction of petitioners' own residence.

In 1991, Mr. Magness requested a $200,000 advance from petitioner to be used to construct two spec houses on lots Mr. Magness purchased in 1987--one at 6016 Corbin Avenue and one at 6020 Corbin Avenue (hereinafter collectively referred to as the Corbin project or Corbin properties). Mr. Magness already had borrowed substantial funds from commercial lenders for the purchase of the lots and construction of the residences and had given those lenders first and second deeds of trust on the Corbin properties. Mr. Magness knew petitioner possessed a real estate license and had built and sold spec houses for a profit in the past. Mr. Magness had never built a spec house of his own. Petitioner estimated that, upon completion, the Corbin properties

---

[3]A spec house is a house constructed by a builder to the builder's specifications with the intention of selling it at a profit upon completion. Since 1977 petitioner has built at least six spec houses, each of which was sold at a profit. Mr. Magness worked as a framer on at least four of petitioner's spec houses.

would be listed for approximately $800,000 each, yielding a profit of approximately $150,000 to $200,000.

Petitioner and Mr. Magness entered into an oral agreement in which (1) petitioner agreed to advance Mr. Magness $200,000 in $25,000 increments while the project was being completed,[4] (2) Mr. Magness agreed to hire petitioner as a consultant during the construction of the Corbin project for a one-time consulting fee of $40,000, due and payable when the Corbin properties sold, and (3) Mr. Magness agreed to repay the $200,000 advance, plus interest, when the project was completed and sold. At the time petitioner advanced the money, both petitioner and Mr. Magness understood that Mr. Magness would not be able to pay petitioner any of the money required under the oral agreement unless the Corbin properties sold.

On or about June 1, 1991, petitioner hired Mr. Magness to supervise the framing and foundation of three spec houses petitioner was building. This arrangement was not connected in any way to petitioner's $200,000 advance. Mr. Magness was not required to provide contracting services to petitioner as a condition of receiving the advance, nor was he asked to provide petitioner with any bills for his services. Petitioner paid Mr.

---

[4]Petitioner made the $200,000 advance to Mr. Magness with checks drawn from petitioners' personal checking account totaling $100,000 and checks drawn from the account of P&S Leasing, Inc. totaling $100,000. P&S Leasing, Inc. is an S corporation owned and operated by petitioner.

Magness at the rate of $25 per hour for his contracting services upon completion of the work.

In August 1991, petitioner's attorney drafted a document entitled "Contract for Services and Consulting Agreement" (Contract). The Contract, made effective as of June 1, 1991, purportedly memorialized part of the oral agreement between petitioner and Mr. Magness. Neither petitioner nor Mr. Magness read the Contract before signing it.

The Contract contained two main sections: (1) Contract for Services and (2) Consulting Agreement. The Contract for Services required Mr. Magness to perform contracting services at a rate of $25 per hour on petitioners' family residence in Dana Point, California, and to submit weekly bills for services performed. The bills were payable on June 1, 1992. The Consulting Agreement provided that petitioner would serve as a "Consultant and as an Advisor" to Mr. Magness for a yearly salary of $40,000 due on June 1, 1992.

Offset provisions in the Contract required that any money payable under either section of the Contract would be offset by money due under the other section. The Contract also contained an automatic termination clause upon the occurrence of a bankruptcy or insolvency of either party. This clause was applicable to the Contract in its entirety.

The Contract did not contain a reference to the Corbin properties or to the $200,000 advance. There were, however, two handwritten notations at the bottom of the Contract: (1) "Richard & Carl Magness shall be responsible for framing and foundation and supervision as per Ed Provost and Richard Magness agreement", and (2) "If Ed Provost does not have the money to fund this agreement there will no liability on his part."

Mr. Magness and petitioner also executed a "Secured Promissory Note", dated June 1, 1991, wherein petitioner promised to lend Mr. Magness $200,000 in eight equal installments of $25,000. In return, Mr. Magness promised to repay petitioner the principal sum of $200,000, plus interest at a rate of 10.5 percent per annum. The principal and interest were due on June 1, 1992. The note was secured by deeds of trusts on the Corbin properties.[5]

Mr. Magness was unable to sell the Corbin properties. On May 10, 1993, Mr. Magness and his wife filed Chapter 7 bankruptcy. They received their bankruptcy discharge on September 14, 1993. Although petitioner filed a proof of claim in the Magness bankruptcy, he did not receive any distribution from the bankruptcy estate.

---

[5]Although the promissory note referred to second deeds of trust, petitioner received a second deed of trust on one of the Corbin properties and a third deed of trust on the other.

In 1993, the first mortgage lenders foreclosed on the Corbin properties.  Petitioners did not receive any distribution as a result of the foreclosure.

Petitioner did not commence a lawsuit against Mr. Magness to collect the money.  Petitioner's attorney advised him not to attempt to collect the money from Mr. Magness because it would be useless to do so.  Mr. Magness never repaid any of the funds advanced by petitioner.

On their Federal income tax return for 1993, petitioners claimed the purported loan was worthless and deducted $200,000 from their taxable income as a business bad debt under section 166.  Respondent disallowed the deduction.

OPINION

Section 166 authorizes a deduction for a business bad debt that becomes worthless during the year.  To be entitled to the deduction, an individual taxpayer must prove (1) the existence of a bona fide debt that obligated the debtor to pay the taxpayer a fixed or determinable sum of money and (2) that the bad debt was created or acquired in "proximate" relation to the taxpayer's trade or business.  United States v. Generes, 405 U.S. 93, 96 (1972); Calumet Indus., Inc. v. Commissioner, 95 T.C. 257, 284 (1990).

The Court of Appeals for the Ninth Circuit, to which this case is appealable, has identified 11 factors to be considered

when resolving whether an advance is bona fide debt or a contribution to capital: (1) Names given to the certificates evidencing indebtedness; (2) presence or absence of a fixed maturity date; (3) source of payments; (4) right to enforce the payment of principal and interest; (5) participation and management; (6) a status equal to or inferior to that of regular creditors; (7) intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of profits; and (11) ability to obtain loans from outside lending institutions. See Hardman v. United States, 827 F.2d 1409, 1411-1412 (9th Cir. 1987); Bauer v. Commissioner, 748 F.2d 1365, 1368 (9th Cir. 1984), revg. T.C. Memo. 1983-120; A.R. Lantz Co. v. United States, 424 F.2d 1330, 1333 (9th Cir. 1970); Anchor Natl. Life v. Commissioner, 93 T.C. 382, 400 (1989). Whether an advance constitutes debt or equity depends on the facts and circumstances of each case. See Calumet Indus., Inc. v. Commissioner, supra at 285. No single factor is determinative. See id. "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." Fin Hay Realty Co. v. United States, 398

F.2d 694, 697 (3d Cir. 1968).  Our analysis of the factors is set forth below.

1.   Certificates Evidencing Indebtedness

The outward form of the transaction is not controlling.  See Bauer v. Commissioner, supra at 1367-1368.  The Court of Appeals for the Ninth Circuit has stated:

> Although the inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties * * * a distinction must be made between objective and subjective expressions of intent.  An objective expression of intent, as contained in the documentation of an advance of money, is generally not to be afforded special weight.  It alone cannot be controlling of the debt-equity issue. * * *  [A.R. Lantz Co. v. United States, supra at 1333.]

Where the form of the advance does not correspond to the intrinsic economic nature of the transaction, labels are not an accurate expression of the subjective intention of parties to a transaction and lose their meaning.  See Fin Hay Realty Co. v. United States, supra at 697 (advances were contributions to capital where "all the formal indicia of an obligation were meticulously made to appear" and shareholders had "power to create whatever appearance would be of tax benefit to them despite the economic reality of the transaction").

In this case, there were several discrepancies between the terms of the documents and the oral agreement between petitioner and Mr. Magness.  For example, according to the Contract, the $40,000 yearly salary for consulting was due and payable on

June 1, 1992. The oral agreement between petitioner and Mr. Magness, however, required a one-time $40,000 consulting fee to be paid only when the Corbin project sold. Another example can be found in petitioner's testimony that, contrary to the terms of the Contract, neither he nor Mr. Magness intended for an offset provision to be included in the Contract.

Both petitioner and Mr. Magness testified that the Contract and the promissory note, purportedly evidencing their agreement, did not accurately reflect the agreed-upon terms. In fact, on brief petitioner points out that "The fact that the parties did not adhere to the terms of the documents is irrelevant, as the documents, which were not read by the parties prior to signature, never reflected the true intent of the parties." Thus, we give the documents little weight and determine the outcome of this case based on the facts and circumstances surrounding the transaction. See Calumet Indus., Inc. v. Commissioner, supra at 288.

2.   Presence or Absence of a Fixed Maturity Date

"The presence of a fixed maturity date indicates a fixed obligation to repay, a characteristic of a debt obligation. The absence of the same on the other hand would indicate that repayment was in some way tied to the fortunes of the business, indicative of an equity advance." Estate of Mixon v. United States, 464 F.2d 394, 404 (5th Cir. 1972); see also sec.

385(b)(1); <u>American Offshore, Inc. v. Commissioner</u>, 97 T.C. 579, 602 (1991). Evidence that a creditor did not intend to enforce payment of the note or was indifferent as to the exact time the note was to be repaid belies an arm's-length debtor-creditor relationship. See generally <u>Gooding Amusement Co. v. Commissioner</u>, 23 T.C. 408, 418-421 (1954), affd. 236 F.2d 159 (6th Cir. 1956).

In the instant case, whether or not petitioner would be repaid was contingent upon the sale of the Corbin properties. Although the terms of the promissory note stated that the $200,000 principal and interest would be due and payable on June 1, 1992, both petitioner and Mr. Magness testified that the note did not properly reflect the terms of their agreement. Under their oral agreement, repayment of the advance was due when the Corbin properties sold, and, in fact, neither Mr. Magness nor petitioner anticipated the advance would be repaid on June 1, 1992. Petitioner testified: "June 1st, '92 the project wasn't done, but it was our understanding that he wasn't going to pay-- he had no way of paying if the project didn't sell, and we both understood that." In reality, no fixed maturity date existed, and repayment was directly linked to the success of the Corbin project. This factor favors respondent's position.

3. Source of Payments

If the source of the debtor's repayment is dependent upon earnings or is from a restricted source, such as a judgment recovery, dividends, or profits, an equity investment is indicated. See Estate of Mixon v. United States, supra at 407; Calumet Indus., Inc. v. Commissioner, 95 T.C. at 287; Dixie Dairies Corp. v. Commissioner, 74 T.C. 476, 495 (1980); Irbco Corp. v. Commissioner, T.C. Memo. 1966-67. In such a case, "the 'lender' acts 'as a classic capital investor hoping to make a profit, not as a creditor expecting to be repaid regardless of the company's success or failure.'" Calumet Indus., Inc. v. Commissioner, supra at 287-288 (quoting In re Larson, 862 F.2d 112, 117 (7th Cir. 1988)). When circumstances make it impossible to estimate when an advance will be repaid because repayment is contingent upon future profits or repayment is subject to a condition precedent, or where a condition may terminate or suspend the obligation to repay, an equity investment is indicated. See Affiliated Research, Inc. v. United States, 173 Ct. Cl. 338, 351 F.2d 646, 648 (1965); Irbco Corp. v. Commissioner, supra.

In this case, repayment of the $200,000 advance and payment of the consulting fee were contingent upon the fortunes of the Corbin project. See Estate of Mixon v. United States, supra at 405; Segel v. Commissioner, 89 T.C. 816, 830 (1987). At the time

petitioner made the advance, both petitioner and Mr. Magness understood that Mr. Magness had no way of repaying the money unless the Corbin properties sold.  Further, they agreed the payments would be made from the sales proceeds of the Corbin properties.

Petitioner contends that his agreement with Mr. Magness did not "turn the loan into an investment" because he "was to be paid when the project sold, not if it sold".  Petitioner also stresses that Mr. Magness' failure to sell the Corbin properties was due to California's failing economy and real estate market.  Although we agree with petitioner that it is difficult to predict how the real estate market will behave in the future, a reasonably prudent person can foresee that the project may not be successful, and the properties may not sell.  Petitioner claims he has sold spec houses in the past for a profit; thus, petitioner either knew or should have known of the risks involved in the Corbin project when he advanced Mr. Magness the money. Petitioner knew at the time he made the advance to Mr. Magness that repayment was impossible unless the Corbin project sold. Under the circumstances, petitioner acted more like a "classic capital investor" than a true creditor.  Calumet Indus., Inc. v. Commissioner, supra at 288.  This factor favors respondent's position.

4.   Right To Enforce the Payment of Principal and Interest

In determining whether petitioner intended to enforce repayment of the advance, an essential element is whether a good-faith intent on the part of the recipient of the funds to make repayment and a good-faith intent on the part of the person advancing the funds to enforce repayment exists.  See Fisher v. Commissioner, 54 T.C. 905, 909-910 (1970).  We must consider whether, under the facts and circumstances of this case, there was a reasonable expectation of repayment in light of the economic realities of the situation.  See Jack Daniel Distillery v. United States, 180 Ct. Cl. 308, 379 F.2d 569, 583 (1967) (citing Irbco Corp. v. Commissioner, supra).

We are not convinced petitioner had a good-faith intention of enforcing repayment.  The testimony clearly indicated that Mr. Magness did not have the means to repay petitioner unless the Corbin properties sold.  Petitioner understood Mr. Magness' financial situation and did not intend to require repayment of the advance unless and until the Corbin properties sold.  Given petitioner's interest in the Corbin project, we do not believe he would have demanded repayment if it would have imperiled the

financial condition or the potential success of the Corbin project.  See Dixie Dairies Corp. v. Commissioner, supra at 495; Gooding Amusement Co. v. Commissioner, supra at 418-419.[6]

Petitioner's right to demand repayment of the advance was limited from its inception.  Petitioner did not intend to demand repayment of the $200,000 advance unless and until the Corbin project was successful.  This factor favors respondent's position.

5.  Participation and Management

If petitioner received a right to participate in the management of the Corbin project in consideration for the advance, such participation tends to demonstrate that the advance was not bona fide indebtedness but rather was an equity investment.  See American Offshore, Inc. v. Commissioner, 97 T.C. at 603.

Prior to the Corbin project, petitioner and Mr. Magness did not have a continuous business relationship; petitioner had retained Mr. Magness approximately four times over the past 20 years to perform framing or construction services.  As a condition for advancing the money, petitioner insisted he be retained as a consultant on the Corbin project because he "wanted

---

[6]In addition, the promissory note was not protected by an acceleration clause or sinking fund in the event of default.  See A.R. Lantz Co. v. United States, 424 F.2d 1330, 1334 (9th Cir. 1970).

input into the project to make sure that they would be successful."

Respondent contends the $40,000 consulting fee was a handsome profit on petitioner's $200,000 investment, and the agreement was indicative of a joint venture. We agree that petitioner's participation in the Corbin project and his relationship with Mr. Magness more closely resembled a joint venture than a debtor-creditor relationship. This factor favors respondent's position.

6. Status Equal to or Inferior to that of Regular Creditors

Whether an advance is subordinated to regular creditors bears on whether the taxpayer was acting as a creditor or an investor. See Estate of Mixon v. United States, 464 F.2d at 406. In addition, "Failure to demand timely repayment effectively subordinates the intercompany debt to the rights of other creditors who receive payment in the interim." American Offshore, Inc. v. Commissioner, supra at 603 (citing Inductotherm Indus., Inc. v. Commissioner, T.C. Memo. 1984-281, affd. without published opinion 770 F.2d 1071 (3d Cir. 1985)).

Mr. Magness continued to pay other creditors in lieu of petitioner after June 1, 1992, the date when petitioner was entitled to repayment of the $200,000 advance, plus interest, under the promissory note and to payment of the consulting fee under the Contract. Petitioner did not demand or expect payment

on June 1, 1992, because, as both petitioner and Mr. Magness testified, payment was due only when the Corbin properties were sold. This factor favors respondent's position.

7. Intent of the Parties

"[T]he inquiry of a court in resolving the debt-equity issue is primarily directed at ascertaining the intent of the parties". A.R. Lantz Co. v. United States, 424 F.2d at 1333 (citing Taft v. Commissioner, 314 F.2d 620 (9th Cir. 1963)). In Taft the court held that an advance constituted indebtedness where the parties executed a "promissory note", the taxpayer's right to enforce payment of the note and the obligation to pay was positive and unconditional, the note was not subordinated to any other indebtedness, there was no change in proportionate equity interest or voting power in the corporation, and repayment of the note was not contingent upon earnings. The parties in Taft intended the advance to be indebtedness, and the advance was carried on the books as a long-term debt. As payments were made over the years, the indebtedness was reduced on the books of the corporation. The note was paid in full.

In this case, Mr. Magness never made a single payment on the alleged debt, nor did he attempt to pay petitioner his $40,000 consulting fee. Moreover, there is no evidence that the debt was carried as indebtedness on the books of the Corbin project; indeed, the record contains no evidence that any such books

existed. It is clear that Mr. Magness viewed his obligation to repay petitioner as a conditional obligation dependent solely on the success of the Corbin project. Mr. Magness was asked at trial, "Are you going to repay Mr. Provost the $200,000 loan?" Mr. Magness responded; "No."

The relevant facts and circumstances support a conclusion that petitioner and Mr. Magness did not intend to create a debtor-creditor relationship. This factor favors respondent's position.

8. "Thin" or Adequate Capitalization

Thin capitalization is strong evidence of a capital contribution where: (1) The debt-to-equity ratio was initially high; (2) the parties realized that it would likely go higher; and (3) substantial portions of these funds were used for the purchase of capital assets and for meeting expenses needed to commence operations. See American Offshore, Inc. v. Commissioner, supra at 604 (citing United States v. Henderson, 375 F.2d 36, 40 (5th Cir. 1967)). We give this factor no weight, however, because the parties did not argue that the evidence directly supported or negated this factor, and the record does not contain sufficient evidence to make our own analysis.

9. Identity of Interest Between Creditor and Stockholder

This factor generally compares the equity ownership of stockholders with their position as creditors in order to

determine whether there is an identity of interest between the two positions.  See American Offshore, Inc. v. Commissioner, supra at 604-605.  If stockholders' advances to a corporation are in substantially the same proportion as their equity ownership in the corporation, it tends to demonstrate that the advances are more in the nature of equity.  See Estate of Mixon v. United States, supra at 409.  "On the other hand, a sharply disproportionate ratio between a stockholder's percentage stockholdings and debt is strongly indicative" that the alleged debt is bona fide.  American Offshore, Inc. v. Commissioner, 97 T.C. at 604.

In this case, Mr. Magness undertook the Corbin project ostensibly as a sole proprietor.  When petitioner advanced the funds to Mr. Magness, petitioner had no existing ownership interest in the project.  Although we view the involvement of petitioner in the Corbin project as being more in the nature of a joint venture, the identity of interest usually examined by this factor simply does not exist in this case.  Consequently, we do not rely upon or apply this factor in making our analysis.

10.  Payment of Interest Only From Profits

"This factor is essentially the same as the third factor, 'the source of the payments.'"  Hardman v. United States, 827 F.2d 1409, 1414 (9th Cir. 1987).  It focuses, however, on how the parties to the alleged debt treated interest.  As we have stated,

"A true lender is concerned with interest." American Offshore, Inc. v. Commissioner, supra at 605 (citing Estate of Mixon v. United States, 464 F.2d at 409). The failure to insist on interest payments indicates that the payors expect to be paid out of future earnings or through the increased market value of their equity interest. See American Offshore, Inc. v. Commissioner, supra at 605 (citing Curry v. United States, 396 F.2d 630, 634 (5th Cir. 1968)).

The alleged debt in this case was to be paid, if at all, from the proceeds generated when the Corbin project was sold. Although petitioner claims that interest was due and would be paid at that time, the critical fact is that Mr. Magness' obligation to make any payment to petitioner was contingent on the liquidation of the Corbin properties. Mr. Magness simply was not required to pay for the ongoing use of petitioner's money as one would expect Mr. Magness to do if the advance were a bona fide debt. Although the advance was dressed up to look like a short-term debt payable in 1 year, petitioner and Mr. Magness did not intend it to be so, nor did they treat it as such. We conclude, therefore, that this factor favors respondent's position.

11. Ability To Obtain Loan From Outside Lending Institutions

"[T]he touchstone of economic reality is whether an outside lender would have made the payments in the same form and on the

same terms."  Segel v. Commissioner, 89 T.C. at 828 (citing

Scriptomatic, Inc. v. United States, 555 F.2d 364, 367 (3d Cir.

1977)); see also Calumet Indus., Inc. v. Commissioner, 95 T.C. at

287.  Petitioner's advance was far more speculative than what an

outside lender would have made, further suggesting it was a loan

in name only.  See Fin Hay Realty Co. v. United States, 398 F.2d

at 697; Dixie Dairies Corp. v. Commissioner, 74 T.C. at 497.

Conclusion

In Calumet Indus., Inc. v. Commissioner, supra at 287, we

found the advances were made at the risk of the business, and it

was unlikely that disinterested investors would have given a

similar "loan".  There were no principal or interest payments and

no evidence that the obligations, in fact, bore interest.

Further, the taxpayer failed to prove (1) the existence of formal

debt instruments, (2) the presence of any fixed maturity dates

for repayment of the advances, or (3) the presence of any

security for the advances.  We also found the advances were made

in proportion to the taxpayer's interest in the venture, and the

company, which was experiencing financial problems, was unable to

establish its own lines of credit or to borrow funds from banks

without the guaranty of the taxpayer.  Significantly, the

taxpayer expected to be repaid from the debtor's future earnings

and profits.  We held that the advances were in the nature of

capital contributions and the taxpayer was a "classic capital investor".  Id. at 288.

Like the alleged debt in Calumet Indus., the $200,000 advance was made at the risk of the Corbin project, and petitioner expected to be repaid from the future profits generated by the sale of the properties.  Petitioner also conceded on brief that Mr. Magness was unable to secure additional loans from outside lenders.  Although "the mere fact that a loan could not be obtained from an unrelated source does not preclude the existence of a bona fide loan", Jack Daniel Distillery v. United States, 379 F.2d at 584, evidence that Mr. Magness could not obtain additional loans from outside lenders is an indication petitioner's advance was an equity investment, especially in light of the fact that repayment was conditioned upon the success of the Corbin project.  When the terms of the advance by petitioner are considered, it is almost inconceivable an outside lender would have advanced Mr. Magness money on similar terms.  This factor favors respondent's position.

The evidence supports respondent's contention that the advance more closely resembled that of an investment in a joint venture between petitioner and Mr. Magness.  Upon consideration of the above factors, we hold that petitioner's advance was not a

bona fide debt within the meaning of section 166[7] and that petitioner is not entitled to a bad debt deduction under section 166.

Accuracy-Related Penalty

Section 6662 authorizes the imposition of an accuracy-related penalty equal to 20 percent of the portion of an underpayment attributable to, among other things, negligence or disregard of rules or regulations. See sec. 6662(a) and (b). "Negligence" includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws, to exercise ordinary and reasonable care in the preparation of a tax return, to keep adequate books and records, or to substantiate items properly. Sec. 6662(c); Allen v. Commissioner, 925 F.2d 348, 353 (9th Cir. 1991), affg. 92 T.C. 1 (1989); Bunney v. Commissioner, 114 T.C. ___ (2000); sec. 1.6662-3(b)(1), Income Tax Regs. The term "disregard" includes any careless, reckless, or intentional disregard. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

If a taxpayer shows there was reasonable cause for any portion of an underpayment and the taxpayer acted in good faith with respect to that portion, the penalty does not apply. See sec. 6664(c)(1); sec. 1.6664-4(a), Income Tax Regs. The

---

[7]Our holding eliminates the need to discuss whether the advance was a business debt and, if so, whether it was worthless. See sec. 166(a), (d).

determination of whether a taxpayer acted in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances. See Compaq Computer Corp. v. Commissioner, 113 T.C. 214, 226 (1999); sec. 1.6664-4(b)(1), Income Tax Regs. Petitioners have the burden of proof on this issue. See Rule 142(a); Allen v. Commissioner, supra.

Petitioners argue that they acted in good faith in determining the correct tax treatment of the $200,000 advance. Petitioners' argument is that the Internal Revenue Service audited their 1991 joint Federal income tax return, upon which they had claimed a similar business bad debt deduction that was ultimately allowed, and that they are entitled to rely on the result in the prior audit. Respondent argues that petitioners acted negligently or with disregard of the rules or regulations because petitioner manipulated the form of the transaction in order to obtain an ordinary loss deduction in the event the Corbin project did not succeed. Respondent further argues petitioners have not shown reasonable cause or that they acted in good faith. We agree with respondent that petitioners have not shown reasonable cause or that they acted in good faith as required by section 6664(c).

Petitioner testified that in 1991 he was consulting for O'Neill & Associates, which went into bankruptcy, that he claimed a business bad debt deduction for an advance made in connection

with those consulting services, and that the Internal Revenue Service audited petitioners and ultimately issued a "no change" on their tax return. The record is devoid of any evidence regarding the 1991 audit except for petitioner's brief self-serving testimony on the topic.[8] We are not obligated to accept the self-serving and uncorroborated testimony of petitioner under these circumstances. See Tokarski v. Commissioner, 87 T.C. 74 (1986). Other than petitioner's testimony regarding the prior audit, petitioner has offered no evidence to prove that petitioners are entitled to relief from the accuracy-related penalty. We conclude, therefore, that petitioners have failed to carry their burden of proof and are liable for the accuracy-related penalty under section 6662.

We have carefully considered all remaining arguments for contrary holdings and, to the extent not discussed, find them to be irrelevant or without merit.

To reflect the foregoing,

Decision will be entered
for respondent.

---

[8]The additional factual assertions in petitioners' reply brief are not part of the evidentiary record. See Rule 143(b).